**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | | |
|---|---|---|
| **FITISTICS, LLC,** | ) | |
|     **A Connecticut Limited Liability Company,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. <u>1:16-cv-00112-GBL-JPA</u>** |
| | ) | |
| **ERIK B. CHERDAK, ESQ.,** | ) | |
|     **149 Thurgood Street** | ) | |
|     **Gaithersburg, MD 20878** | ) | |
| | ) | |
|     **Defendant.** | ) | |

| | | |
|---|---|---|
| **ERIK B. CHERDAK,** | ) | |
| | ) | |
|     **Counterclaim Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. <u>1:16-cv-00112-GBL-JPA</u>** |
| | ) | |
| **FITISTICS, LLC,** | ) | |
| | ) | |
| **SEAN L. MCKIRDY (in his individual capacity)** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **ISCAN2D TECHNOLOGIES, LLC.,** | ) | |
| | ) | |
|     **Counterclaim Defendants.** | ) | |

In and for his Counterclaim against the above-named Counterclaim Defendants ("Defendants" or "MCKIRDY") Counterclaim Plaintiff Erik Cherdak ("Cherdak" or "Plaintiff") hereby submits this Counterclaim in which he seeks remedies in relation to the Counts and causes of action set forth herein.

## **PARTIES**

1. Cherdak is an individual residing at 149 Thurgood Street, Gaithersburg, Maryland 20878.

2. Counterclaim Defendant Fitistics, LLC is an alleged Connecticut Limited Liability Company having an alleged principal place of business at 83 Northwood Road, Newington, CT 06111.

3. Counterclaim Defendant Sean L. McKirdy is an individual residing at 83 Northwood Road, Newington, CT 06111. McKirdy has personally directed, participated in, and supervised Fitistics' filing and pursuit of Fitistics' Complaint against Cherdak in this action and Fitistics' fraud and iScan2d's copyright infringement.

4. Counterclaim Defendant iScan2d Technologies, LLC is Connecticut LLC allegedly having a principle place of business at the residence of Mr. McKirdy's at 83 Northwood Road, Newington, CT 0611.  According to Connecticut's Secretary of State, Mr. McKirdy is the sole member of iScan2d Technologies, LLC.  iScan2d allegedly is in the business of nationally licensing its alleged technologies, products and services throughout the United States.  McKirdy has personally directed, participated in, and supervised Fitistics' fraud and iScan2d's infringement of Cherdak's copyrights.

## JURISDICTION AND VENUE

5. This is an action among citizens of different states within the United States.  Jurisdiction is proper under 28 U.S.C. § 1338 (Diversity of Citizenship).  There is complete diversity of citizenship between Cherdak and all Defendants, and the amount in controversy exceeds $75,000, exclusive of interest, costs and attorneys' fees.

6.    Supplemental jurisdiction also exists because Cherdak's counterclaims arise from and relate to the same contracts, transactions, occurrences, and nucleus of operative facts as the claims asserted by McKirdy through Fitistics' in Fitistics' Complaint in this action.

7.    Jurisdiction and Venue are proper in this Court as MCKIRDY has transacted business in Virginia by supervising and commencing litigation and appearing for hearings here, and iScan2d has sold or licensed infringing products and software in this State, District and Division.

## FACTUAL BACKGROUND

8. In late 2012 through mid-2013, MCKIRDY through Fitistics sold and assigned certain patents and software copyrights to Cherdak in return for half of the net proceeds that Cherdak would earn through licensing, enforcement and litigation.  In doing so, Fitistics and Mr. McKirdy fraudulently misrepresented and concealed the fact that they had expressly or implicitly licensed the relevant patents and copyrights to many of the suspected infringers who were agreed to be litigation targets.   Fitistics and Mr. McKirdy also fraudulently misrepresented and concealed that they had actively encouraged and assisted several of the suspected infringers who were agreed to be litigation targets in developing, improving and commercializing their infringing products and software.   Fitistics and Mr. McKirdy intentionally misrepresented and concealed these facts, knowing that they were material, and knowing that Cherdak would not have agreed to pay them fifty percent of the net proceeds from the enforcement, licensing and litigation – and likely would not have acquired the patents and copyrights at all – had Fitistics and Mr. McKirdy disclosed or not concealed the active encouragement and support they had provided to the target companies in developing, improving and commercializing their competing and infringing products and software.

9. On December 12, 2012, the parties entered into a certain Copyright Assignment Agreement under which Cherdak would be able to enjoy all rights in and to certain computer

software and in relation to certain corresponding copyrights. The Copyright Assignment Agreement was negotiated in person between Cherdak and McKirdy on behalf of Fitistics in Maryland and in Washington, DC. Those copyrights include U.S. Copyrights Registration Nos. TX0007689404 and TX0007597120 (hereinafter the "Copyrighted Works").  The Copyrighted Works are directed to computer software designed and implemented to facilitate the gathering of data from cardio exercise machines (treadmills, stationary bikes, etc.), encrypting received and processed data, and recording that data to a portable memory device like or similar to a USB flash drive for later upload to a web-based exercise data tracking system.  The Copyright Assignment Agreement contains certain express representations and warranties that were fraudulently made and which have been materially breached in such ways that give rise to this action and to Cherdak's right to remedies for the harms that Cherdak has suffered in reliance on  Defendants' fraudulent misrepresentations by Fitistics and Mr. McKirdy made prior to the effective date of the Copyright Assignment Agreement and also before the date of the parties' Patent Assignment Agreement.

10. To graphically illustrate the extent of the Copyrighted Works, Fitistics and Mr. McKirdy assisted Cherdak in preparing a block diagram depicting computer software routines and processes within the Copyrighted Works as follows:



**Fig. 1 - Copyrighted Works Block Diagram**
**(Defendant McKirdy assisted in the preparation of this Diagram)**

11.  The Copyrighted Works were implemented to be included within a package that may be implemented as a stand-alone interfacing device that may be coupled to a cardio exercise machine (e.g., a treadmill) *via* a standardized data communications interface (e.g., "CSAFE" facilities within the cardio exercise machine).  Additionally, the Copyrighted Works may also be implemented to be integral technologies included within data processing systems of cardio exercise machines.  In any arrangement, it is the Copyrighted Works and the software encoded therein that provides the functionality of allowing for data to be extracted from a cardio exercise machine, processed and possibly encrypted, and transmitted (via a wired or wireless arrangement)

to another device for at least temporary storage to facilitate downstream exercise data processing and related cardio exercise machine monitoring.  In this action, exemplary implementations of the Copyrighted Works might be referred to as "DOCKING STATIONS," a "CSAFE module," a "CSAFE WIFI module" for wireless transmission of data gathered from a cardio exercise machine such via the CSAFE protocol, etc.  The Copyrighted Works enable implementations of "CSAFE" interfacing devices and technologies.  The Copyrighted Works together with certain related patents which also were assigned to Cherdak pursuant to a July 2013 Patent Assignment Agreement are referred to herein as the "Assigned Technologies" or the "Cherdak Technologies."

12. Defendant Fitistics, LLC is fundamentally a company that exists in name only out of Defendant McKirdy's residence.  On information and belief, Fitistics has no infrastructure, no income, no assets of any significance and, instead, relies on its alleged president, Mr. Sean McKirdy, to co-mingle his assets and personal property to create an appearance that Fitistics, LLC is a going concern.  In fact, Mr. McKirdy uses his own personal cell phone to run a number of companies out of his residence while simultaneously maintaining a full-time job for an entity by the name of Diba Industries, Inc. in Connecticut.  Mr. McKirdy operates his unveiled entities out of his residence including, but not limited to, Fitistics, LLC, iScan2d, LLC, SLM CONSULTING, LLC, Fitness Technologies, LLC and possibly others. Mr. McKirdy operates his alter-ego companies as such in attempts to shield himself from liability for his direct acts and misconduct. Mr. McKirdy has been successful in securing relationships with attorneys and others to represent Fitisitics only to result in termination of such relationships when it has been discovered that Mr. McKirdy misrepresented facts and circumstances related to his claims and demands against others. For example, Cherdak learned that Mr. McKirdy assigned rights in and to certain patent assets to his wife and/or possibly to other family members, individuals or entities to prevent such patent

assets from being licensed or assigned by Fitistics and Mr. McKirdy to third parties, including Cherdak. Mr. McKirdy and Fitistics, LLC are, for all intents and purposes, one and the same. Defendant Fitistics, LLC can take no action unless Mr. McKirdy solely approves of the same. Mr. McKirdy mishandled the Copyrighted Works originally and allegedly belonging to Fitistics, LLC and granted or allowed third parties to obtain rights of fair use and express or implied licenses to use and fully enjoy the Copyrighted Works.

13. Mr. McKirdy and Fitistics offered the technology and business it had sold to Cherdak as being available for purchase or license, and they offered and sold Mr. McKirdy's services full-time employment, consulting, etc. in relation to commercializing and improving technologies embedded in the Copyrighted Works. Fitistics and Mr. McKirdy hired him out for work that involved sharing and transferring substantial copyrighted and patented technology to third parties who intended to have an unfettered fair right to use such copyrighted and patented technology in their products. Neither Fitistics or Mr. McKirdy ever executed any form of agreement with the target companies reserving Fitistics IP rights. Worse yet, Defendants have in the past used and continue to use copyrighted and patented materials within the Assigned Technologies to design without authority from Cherdak to implement and otherwise enjoy the Assigned Technologies. Several different companies all being operated out Mr. McKirdy's residence are still licensing and transferring infringing technologies embedded in the Assigned Technologies.

14. The purpose of the Copyright Assignment Agreement and Patent Assignment Agreement was to allow Plaintiff to fully enjoy any and all rights and benefits conferred by and in relation to certain fitness equipment patents and copyrights in and related to computer software – and to be the sole entity that could enjoy such rights and benefits. The parties clearly intended and provided that Cherdak would be able to license the Assigned Works and assert claims for patent

and copyright infringement in federal courts against third parties who had infringed the patents or copyrights.    Defendants knew and agreed that Cherdak intended to and would exercise his rights under the Copyright Assignment Agreement and Patent Assignment Agreement through litigation, licensing and enforcement.  Defendants understood that Cherdak would be spending his valuable time pursuing copyright and patent infringement claims instead of pursuing other litigation and claims solely on Cherdak's own behalf in relation to his own, invented technologies and patents, and on behalf of others in the expert witness marketplace.  Defendants' knew that Plaintiff was going to enforce the copyrights and patents by way of litigation against agreed upon target companies whom Defendants had identified as entities that allegedly had made improper access to the Assigned Technologies and who nonetheless copied the same in substantial ways in violation of the U.S. Copyright Act and patent laws.

15. Defendants Fitistics and Mr. McKirdy misrepresented and concealed the fact that they had conveyed technologies, know-how, and trade-secrets embedded in the Assigned Technologies to certain target entities and thereby fraudulently induced Cherdak into entering into the Copyright Assignment Agreement and the Patent Assignment Agreement, assigning half of the net revenues to Fitistics, and pouring thousands of hour of his time into trying to generate revenues under those agreements.    Defendants McKirdy and Fitistics made material misleading and false statements on entry into the Copyright Assignment Agreement and Patent Assignment Agreement that they continued to assert until September, 2015 when Cherdak then confirmed that Defendants had conveyed proprietary technology to third parties and allowed such third parties to use the Assigned Technologies free and clear of interference from the Defendants.  Defendants were driven by self-dealing and personal gain, and Cherdak reasonably relied on Defendants' misrepresentations and concealments.  They induced Cherdak to perform valuable and time consuming litigation activities

in an inconvenient jurisdiction all the while knowing that McKirdy had granted at least equitable rights to fairly use the Assigned Technologies to target entities suspected of infringement.

16.   Prior to signing the Assignment Agreements, Cherdak questioned Mr. Sean McKirdy about the Assigned Technologies.  Mr. McKirdy and Fitistics were requested to produce any and all agreements and related information and documents concerning any licensure or the granting of any rights by Defendant Fitistics or its employees, principals or agents in and to the Assigned Technologies and any literal and non-literal elements thereof.  No licenses or assignments were disclosed to Cherdak and Mr. McKirdy expressly indicated that no such agreements and information existed.  Mr. McKirdy and Fitistics were requested by Cherdak to produce any documents relating to work efforts by Mr. McKirdy and other Fitistics agents, employees or principals on behalf of any third party who may assert a claim of ownership or any form of license or right to use the Assigned Technologies or elements thereof.  No information was disclosed to Cherdak and Mr. McKirdy expressly indicated that no such agreements existed and that no such work efforts had occurred.  Mr. McKirdy and Fitistics were requested to produce any and all documents and evidence related to consulting or work efforts and employment by any of the Defendants' employees, principals, or agents in relation to the Assigned Technologies.  None were disclosed and Mr. McKirdy advised Cherdak that Mr. McKirdy had never worked for any other entity in any capacity which reasonably could assert any right to use the Assigned Technologies. Finally, Mr. McKirdy and Fitistics were requested to produce any and all documents related to any know-how and trade secret information related to and/or embedded within the Assigned Technologies that may have been provided to any third party in any type of business relationship. Again, nothing was provided and Mr. McKirdy and Fitistics stated to Cherdak that Mr. McKirdy had never worked for any other entity who could assert any right to use the Assigned Technologies

beyond a defunct UNISEN, INC. by which Mr. McKirdy had been employed.  Defendants'
statements were knowingly false and were intentionally made to induce Cherdak to enter into the
Assignment Agreements.    In conversations before the signing of the Assignment Agreements,
Fitistics and Mr. McKirdy failed to mention that Mr. McKirdy and Fitistics had worked for KoKo
Fitness, Inc. and/or Koko Fitclub, LLC (collectively "KoKo") and had delivered and shared critical
components and constituent elements and know-how embedded within the Assigned Technologies
to and with Koko.

17.  With complete and reasonable reliance on Mr. McKirdy's and Fitistics' assertions and
averments as to the non-existence of any agreement or other factual material demonstrating that
any third party could ever assert any equitable right of use, fair use, ownership such as by way of
work-for-hire, and/or any implied or express license or otherwise, Cherdak actually and reasonably
relied on Mr. McKirdy's and Fitistics' misrepresentations and concealments,  and Cherdak agreed
to enter into the Copyright Assignment Agreement effective as of December 12, 2012, and later
the Patent Assignment Agreement, based on his  reasonable reliance.  Whether Defendants had
granted any rights either expressly or impliedly concerning the Assigned Technologies conveyed
under the Assignment Agreements were material matters related to the basis of the bargain to
which Cherdak and Defendants Fitistics and Mr. McKirdy had agreed in effectuating the Copyright
Assignment Agreement.  The encumbrances on and licenses to the Assigned Technologies
adversely and materially impacted Cherdak's ability to enforce, monetize, use and enjoy the rights
that he bargained for under the Assignment Agreements.  Such matters were of such paramount
importance to the Cherdak that he required the Copyright Assignment Agreement to include
express representations and warranties by Fitistics.    Fitistics and Mr. McKirdy therefore knew
that their assistance and encouragement of target entities like KoKo in their development,

commercialization and improvement of competing and infringing products and technologies were material adverse facts which – if not concealed from Cherdak – would have caused Cherdak not to accept or enter into the Assignment Agreements and not to spend thousands of hours litigating, enforcing and licensing the Assigned Technologies.

18.  As it would turn out over time, Cherdak learned that Fitistics and McKirdy materially misrepresented their original ownership and rights conveyed in the Assigned Technologies as contemplated by the Assignment Agreements, and Cherdak had no way of knowing otherwise when the Agreements were signed and entered into.  Cherdak reasonably relied on the express promises and material misrepresentations and concealments of Fitistics and its Mr. Sean McKirdy.

19.  In accordance with his rights in and to the Assigned Technologies as conferred on Cherdak by the Assignment Agreements, Cherdak began a pre-filing investigation related to entities identified by Mr. McKirdy as alleged target infringers, namely KoKo Fitness, Inc. and KoKo FitClub, LLC (together "KoKo").  In August, 2013, Mr. McKirdy revealed that he had had detailed "discussions" with KoKo that involved Mr. McKirdy reviewing certain software and hardware developed by the KoKo entities. *See* **Ex. 1.**  According to Mr. McKirdy, those discussions culminated in Mr. McKirdy signing a NON-DISCLOSURE AGREEMENT with KoKo Fitness, Inc. so that the KoKo entities could disclose their proprietary information to Mr. McKirdy under the protections of the NON-DISCLOSURE AGREEMENT. *See* **Ex. 2**. That NON-DISCLOSURE AGREEMENT was NOT mutual in its terms and did not provide for any protections of proprietary technologies allegedly belonging to Fitistics that Mr. McKirdy and Fitistics ultimately transferred and disclosed to KoKo.

20.  When Cherdak questioned Mr. McKirdy regarding that NON-DISCLOSURE AGREEMENT, Mr. McKirdy emphatically asserted that he had not received any proprietary

information from the KoKo entities.  *See* **Ex. 3** (Mr. McKirdy stating: "I never received any proprietary information. Discussions went silent quickly after I met with them [the KoKo entities] up in their Mass office.").  Mr. McKirdy's assertions were knowingly false when they were made. In fact, Mr. McKirdy would later admit (as discussed below) that Mr. McKirdy had in fact received proprietary information from the KoKo entities.  Worse yet, Cherdak would later learn that Mr. McKirdy had in fact provided critical portions of and know-how embedded within the Assigned Technologies to KoKo to help it fix its software implementations to bring its products to market free of "data dropping issues" and the like.  *See* **Ex. 4**.

22. In short, Defendants McKirdy and Fitistics had actively and knowingly assisted and encouraged KoKo's development of the very same products and software over which Fitistics and Mr. McKirdy told Cherdak he should sue KoKo for infringement of the Assigned Technologies, and they misrepresented and concealed those facts in their dealings and Copyright Assignment Agreement with Cherdak.

22. On September 3, 2013, Plaintiff commenced litigation against KoKo in the U.S. District Court for the Eastern District of Virginia, which action was subsequently transferred over Cherdak's objection to the U.S. District Court for the District of Massachusetts (Boston).  During the course of that litigation, Cherdak learned details concerning the fact that Mr. McKirdy had received proprietary information belonging to the KoKo entities and, in particular, information related significant problems associated with the KoKo entities enabling their USB based docking stations and, more particularly, information related to certain problems associated with their computer software and related products that were to be used as "USB Docking Stations" that allowed workout data to be reliably requested from a cardio exercise machine, organized, encrypted, and stored on a USB Flash Drive – features just like those provided by and embedded

within the Assigned Works.  *See* **Ex. 5**.  Mr. McKirdy and Fitistics represented to Cherdak that they were the first to develop computer software and related USB Docking Station hardware in accordance with the Assigned Works and that KoKo was desirous of bringing their own USB Docking Stations to market in their new franchised health-club business model (the "KoKo FitClub System").

23.  During the *Cherdak v. KoKo* case, Cherdak learned that Mr. McKirdy had held himself out to KoKo as an expert in the field of exercise data gathering and tracking, and that as such, he sought full-time employment with KoKo in 2010.  *See* **Ex. 6** (Email from Sean McKirdy to Mr. Michael Lannon of the KoKo entities requesting employment); *see* **Ex. 7** (Resume provided to the KoKo entities per **Ex. 7**).  In **Ex. 6**, Mr. McKirdy wrote to the KoKo entities and stated: "If you and Josh [Roman, VP-Technology for KoKo] think there might be a fit for me on the KoKo team, I would be more than happy to review any opportunities with you…."  Cherdak learned about Mr. McKirdy's pursuit of full time employment with KoKo from documents produced by KoKo in the *Cherdak v. KoKo* case.   Mr. McKirdy had never advised Cherdak that Mr. McKirdy had sought full time employment with KoKo nor that he had shared Assigned Technologies to KoKo to promote his employment prospects.

23. Also during the *Cherdak v. KoKo* case, Cherdak learned that Mr. McKirdy agreed to be a consultant to KoKo to assist KoKo in addressing certain problems associated with their USB docking stations – problems Mr. McKirdy asserted were within his knowledge and expertise.  In fact, on April 23, 2010, per the urgings of Mr. McKirdy and Fitistics, KoKo agreed to employ Mr. McKirdy to help the KoKo entities address the problems earlier identified by KoKo to Mr. McKirdy.   In the *Cherdak v. KoKo* case, Cherdak learned that Koko had agreed to enter into a consultancy relationship with Mr. McKirdy based on his abilities to solve KoKo's problems in

bringing a commercially viable data tracking product to market.  *See* **Ex. 4**.  In **Ex. 4**, Mr. Lannon,

KoKo's President, CEO and lead inventor, wrote:

> Just got off the phone with Sean [McKirdy].  Good conversation…he [McKirdy]
> was eager to suggest that he thinks he could be very helpful on a consulting
> basis…Specifically, he thinks he would be able to quickly determine if he could
> help with our "data dropping" issue after meeting with Charbel…He thinks he
> could, but needs to dig a little deeper with Charbel to be sure…**After that, he
> would interested in consulting to share his knowledge (and his developer's
> knowledge) to solve our stability issues and possibly to help us be able to
> become manufacturer agnostic**.

(emphasis supplied).

24.  At some time in the May to July, 2010 timeframe, Mr. McKirdy actually ***agreed to

work for KoKo*** as Mr. Lannon described and so that Mr. McKirdy and Fitistics could share

knowledge and transfer certain know-how and technical information contained in the Assigned

Technologies, among other things, to solve KoKo's data dropping issues and to allow KoKo's

products to become manufacturer agnostic – i.e., to work with exercise machines made by any

manufacturer.  Such data integrity and being manufacturer agnostic are critical aspects and

elements contained in the Assigned Technologies.  In fact, the central value proposition to the

Assigned Technologies is that they facilitate data communications and gathering with cardio

exercise machines made by any vendor (manufacturer agnostic) in reliable, stable ways and

without losing or "dropping" data in the process.  Without squarely addressing such issues as they

are addressed in the Assigned Technologies, no product could achieve commercial viability and

be vendor agnostic – the exact issues and reasons that KoKo hired Mr. McKirdy and Fitistics to

share valuable knowledge and technology embodied in the Assigned Technologies.

25.  To date, Mr. McKirdy and Fitistics have never provided any express consulting or any

other agreement that contains any reservation of rights in and to the inventions, copyrighted

materials, know-how, and trade secrets contained in the Assigned Technologies and that were

delivered to KoKo for Mr. McKirdy's personal economic gain. Mr. McKirdy and Fitistics gave away rights embodied in the Assigned Technologies under doctrines of equity and fair use and express and implied license without any reservation of such rights to Fitistics or Mr. McKirdy.  As such, Mr. McKirdy and Fitistics have fraudulently induced, and have breached the representations and warranties in, the Copyright Assignment Agreement that they would later induce Cherdak to make and sign.   Without such a reservation of rights, the portions of the Assigned Technologies conveyed to KoKo could be used freely and under doctrines grounded in equity and fair use, express and implied license, shop-rights, and other notions of built on fundamental fairness.  Mr. McKirdy and Fitistics were hired by Koko to deliver and transfer critical knowledge and technology for KoKo's commercial gain – and not for any reason such as criticism, comment, news reporting, education, scholarship or research. Koko paid Mr. McKirdy and Fitistics to transfer substantial know-how and trade-secret information contained in the Assigned Technologies, and Mr. McKirdy agreed to such transfers so that KoKo could incorporate the Assigned Technologies to solve Koko's technical problems and bring products to market for commercial gain and profit.  After all, Mr. McKirdy was seeking a job with KoKo and he would do anything to impress KoKo with his technical knowledge that was developed under the auspices of "Fitistics."

26.   During discovery in the *Cherdak v. KoKo* case, Mr. McKirdy revealed to Cherdak, for the first time in September, 2015, extremely damaging email correspondence about his actual consulting efforts on behalf of Koko.  *See* **Ex. 8**.  **In Ex. 8** Mr. McKirdy wrote to Koko as follows: "This [consulting] will allow me to work with Charbel [Chief Engineer at KoKo] and see if there are any opportunities for improvement or changes that will benefit your current [software and hardware] implementation." Mr. McKirdy's email communication was not provided to Cherdak

by Mr. McKirdy until on or about September 17, 2015.  Importantly, the defendants in the *Cherdak v. KoKo* case provided the same email to Plaintiff on or about September 20, 2015.   See Ex. 8. Mr. McKirdy also provided for the first time in September, 2015 email correspondence originally sent by the lead engineer for KoKo,  Mr. Charbel Elkhoury, that provided an agenda for meetings and communications with Mr. McKirdy – such agenda items included points as follows: "Demo of the [KoKo] program, different components, known issues (Charbel [lead KoKo Engineer])…**Suggestions from Sean [McKirdy] on CSAFE implementation** (Sean [McKirdy])…**Hands On Session (Sean, Bin and Charbel) to implement recommendations and suggest others as we go**." *See* **Ex. 9** (emphasis supplied). The CSAFE implementation details suggested by Defendants McKirdy and Fitistics were directed to substantial and critical aspects of the Assigned Technologies.    Mr. Elkhoury's email of June 25, 2010 read as follows:

> Charbel Elkhoury <celkhoury@kokofitness.com>
> To: Sean McKirdy <fitistics@gmail.com>, binli120@gmail.com
> Cc: Josh Roman <jroman@kokofitness.com>
>
> Gents,    Here's the agenda for our Monday meeting. We're planning a whole day, after which we can determine if and when a second session is needed.
>
> Here's my agenda:
> 9 AM - 10:30 AM: ***Demo of the program, different components, known issues (Charbel)***
> 10:30 AM - 10:40 AM Break
> 10:40AM - 11:20 AM: ***Suggestions from Sean on CSAFE implementation (Sean)***
> 11:20AM - Noon: Suggestions from Bin on Windows CE implementation (Bin)
> Noon - 1PM lunch    1:00PM - 4:30PM: Hands On Session (Sean, Bin and Charbel) ***to implement recommendations and suggest others as we go.***
> 4:30PM - 5:00PM Demo of the product / and recommendations for a new session if needed. (Charbel)
>
> Thanks, Charbel
>
> (emphasis supplied).

27. Mr. Charbel Elkhoury's email is telling as he clearly indicated that Mr. McKirdy and Fitistics would be exposed to "different components" and "known issues" associated with KoKo's challenged SMART TRAINER computer code and systems.  Mr. McKirdy's "suggestions" on CSAFE implementation details were direct disclosures to Koko of critical aspects of the Assigned Technologies that were transferred to Koko at its request and per agreement with Mr. McKirdy and Fitistics.   Tellingly, Mr. Elkhoury's email agenda demonstrates that it was KoKo's intention to sit with Mr. McKirdy in a "Hands On Session" to "implement recommendations" (as programmers and technologists often do while examining software code) and suggestions shared by Mr. McKirdy.  Mr. McKirdy was apprised in advance of his expected work efforts on behalf of Koko and that Koko had the express intention to incorporate and implement computer software and, in particular, aspects of the Assigned Technologies into KoKo's Smart Trainer software systems per recommendations, suggestions and knowledge shared by Mr. McKirdy during his paid consultancy on behalf of Koko.  Mr. Elkhoury's agenda for work efforts performed by Mr. McKirdy directly contradicts Mr. McKirdy's false and misleading earlier statements to Defendant.  *See* **Ex. 3** (Mr. McKirdy stating: "I never received any proprietary information…discussions went silent quickly after I met with them [the KoKo entities] up in their Mass office.").

28. Mr. Elkhoury's email in **Ex. 9** includes Mr. McKirdy's acknowledgement of the purposes and intentions of Koko.   In the same email thread, Mr. McKirdy wrote "Sounds good." Mr. McKirdy never asserted any clarification as to a reservation of rights in and to any proprietary information that he and Fitistics would share with Koko.

29. Despite Mr. McKirdy's knowingly false statements to and fraud perpetrated on Cherdak, discussions between Mr. McKirdy and Koko did NOT go silent as Mr. McKirdy misrepresented to Cherdak, but rather continued.  In fact, Mr. McKirdy actually reached out to and

communicated with Koko on numerous occasions after an initial wave of consulting.  For example,

Mr. McKirdy actually pursued more consulting business and money from Koko when he offered

to further consult to further assist Koko by offering even more critical know-how embedded within

the Assigned Technologies.  *See* **Ex. 10**.  In fact, after the first round of services and deliverables

provided to KoKo, Mr. McKirdy apparently sought to provide even more proprietary technology

to facilitate further modification of KoKo's software implementation in their SMART TRAINER

products. In **Ex. 10**, Mr. McKirdy wrote:

> Let me know if you need anything else. Also, have you Mike decided if you will
> be engaging me in ***anymore*** consulting services to assist Charbel in modifying
> CSAFE implementation of the Smart Trainer?

> (emphasis supplied).

30.   Mr. McKirdy was hired to deliver and transfer certain substantial inventions, know-

how, trade-secret and other confidential information contained in the literal and non-literal

elements of Assigned Technologies to Koko for its use in bringing to market working,

commercially viable USB docking stations that operated in accordance with vital features of the

Assigned Technologies.   In short, Mr. McKirdy was hired to help KoKo modify and implement

their software systems to facilitate a commercially viable KoKo USB docking station. Mr.

McKirdy provided critical information to KoKo's lead technologist and other programmers on a

work-for-hire basis during "Hands On Meetings" related to certain protocol anomalies associated

with KoKo's non-working USB docking stations and, in particular, critical information about

gathering cardio exercise machine data that had been fully addressed by Mr. McKirdy and Fitistics

in development of products Fitistics had earlier, but unsuccessfully, tried to market.  At no time

prior to the effective date of the Assignment Agreements or commencement of the *Cherdak v.

KoKo* case, had Mr. McKirdy or Fitistics ever disclosed any detailed information related to Mr.

McKirdy's work efforts on behalf of Koko and his transfer of proprietary technology through his work efforts for and employment by Koko. *See* **Ex. 11** (Email thread in which Mr. McKirdy billed for consulting services rendered on behalf of himself and Fitistics to Koko); *see* **Ex. 13** (an invoice from Mr. Sean McKirdy to KoKo originally sent by Mr. McKirdy on July 8, 2010).

31. Mr. McKirdy's email in **Ex. 12** is telling.  That email demonstrates that Mr. McKirdy and Fitistics were knowingly commissioned (consistent with KoKo's intentions) to facilitate transfer of proprietary technology contained in the Assigned Technologies and to share knowledge to assist Koko in modifying CSAFE implementations in KoKo SMART TRAINER products and software.   *See* **Ex. 4** (KoKo's Michael Lannon stating: "**[H]e [Sean McKirdy] would be interested in consulting to share his knowledge (and his developer's knowledge) to solve our stability issues and possibly to help us be able to become manufacturer agnostic**. (emphasis supplied).

32. The representations and warranties set forth in the Copyright Assignment Agreement certainly were breached by and inconsistent with Mr. McKirdy's and Fitistics' consulting relationships for which Mr. McKirdy and Fitistics were paid for very important services and technology transfers to KoKo at its express request.  Importantly, Mr. McKirdy ignored Fitistics when he requested that Koko pay Mr. McKirdy directly as opposed to Fitistics. Mr. McKirdy uses Fitistics as a flimsy shield to protect against liability, but Mr. McKirdy seeks to receive payments directly when possible.  *See* **Ex. 13** (Invoice from Sean McKirdy Personally – "Make All Checks Payable to Sean McKirdy.").

33. In the *Cherdak v. KoKo* case, Plaintiff brought claims, *inter alia*, for patent infringement and copyright infringement related to the Assigned Technologies as incorporated into KoKo's commercial USB Docking Station product offerings within KoKo's Smart Trainer product

lineup.   Critical and substantial proprietary technology included within KoKo's USB docking stations directly correlate to Mr. McKirdy's and Fitistics services for and technology transfers to Koko.   In particular, Cherdak accused Koko of infringing proprietary aspects of the Assigned Technologies  associated with addressing certain USB Docking Station CSAFE protocol anomalies, the issuance of protocol command requests for exercise data from a cardio exercise machine, timing of data requests associated with issuing CSAFE protocol-based requests, ordering of command requests, encryption of gathered data retrieved from exercise machines resulting from CSAFE-based command requests, and the ordering of CSAFE command requests and sequences for proper storage of exercise-related data onto a USB flash drive and otherwise.   And, in rendering consulting services, Mr. McKirdy and Fitistics certainly had access to and reviewed certain proprietary information belonging to Koko – information for which Koko demanded and received a NON-DISCLOSURE AGREEMENT in the process.   *See* **Ex. 14**.   Koko did the right thing for itself and prudently sought to protect the ownership and disclosure of its confidential and/or proprietary information by demanding that Mr. McKirdy and Fitistics execute a NON-DISCLOSURE AGREEMENT.   *Id*. (KoKo writing: "If they [Fitistics and Mr. McKirdy] ask for more information, then the next level of details is to show them pieces of the code itself, and that would definitely require signing an NDA.").   As facts would develop in the Koko case, Mr. McKirdy and Fitistics signed KoKo's NDA and they (Fitistics and Mr. McKirdy) would in fact be shown pieces of KoKo's computer software code – all so that Mr. McKirdy and Fitistics could sit with KoKo's lead software developer and programmer in a "Hands On Session" to implement changes based on the Assigned Technologies.

34.  Needless to say, upon learning that Mr. McKirdy and Fitistics transferred key aspects of the Assigned Technologies to Koko that created nothing less than an express or implied license

in the technology in suit, the *Cherdak v. KoKo* case and, in particular, Cherdak's litigation positions relative to copyright and patent infringement, were largely obliterated.  Mr. McKirdy and Fitistics had effectively rendered Cherdak's copyright and patent infringement claims against Koko meritless, subject to meritorious defenses by Koko (equitable estoppel, license and acquiescence), and such defenses placed Cherdak in the position of having erroneously advanced and needing to drop claims that should not have been brought in the first place.  Mr. McKirdy and Fitistics actually encouraged and assisted the KoKo in building out the very products and software that Defendants has caused Cherdak to accuse of infringement in the *Cherdak v. KoKo* case.

35. Cherdak never would have asserted patent and copyright infringement claims against Koko had Cherdak known about Defendants' prior dealings and transfers of the Assigned Technologies to Koko for which Mr. McKirdy and Fitistics were paid.

36. In the *Cherdak v. KoKo* case, KoKo asserted numerous defenses to copyright infringement, *inter alia*, based on Fair Use and Equitable Estoppel. At the time that such defenses were raised and reviewed by Mr. McKirdy early on in the KoKo case, Mr. McKirdy expressed to Plaintiff that such defenses were meritless as he again alleged in late 2013 that neither he nor Fitistics ever transferred any know-how to the KoKo entities let alone having worked for the KoKo entities for that very purpose.  Mr. McKirdy emphatically asserted that he had no prior relationship with KoKo other than a NON-DISCLOSURE AGREEMENT under which Mr. McKirdy asserted that he never received any "proprietary" information from Koko.  *See* **Ex. 3**. Koko asserted defenses to patent and copyright infringement such as fair use, copyright misuse, and equitable estoppel:

60.   Cherdak's claims are barred by the doctrine of equitable estoppel to the extent Cherdak and his predecessors-in-interest were aware of Defendants' business, including the products and activities now accused of infringement, long before filing of this ligation and through subsequent actions and inaction led Defendants to believe they could continue in their business without fear of litigation.   Defendants reasonably relied on these actions to their detriment.

37. From the early stages of the protracted and expensive litigation in the *Cherdak v. KoKo* case, Koko relied on their dealings with Mr. McKirdy and Fitistics. to make out their defenses as later documented through damaging documentation and facts that surfaced in discovery in that case.  However, Cherdak was misled and kept in the dark about Mr. McKirdy's and Fitistics' past dealings and Mr. McKirdy's and Fitistics' disclosure and transfer of Assigned Technology to Koko. It was not until Mr. McKirdy was threatened personally with a motion to compel discovery in the *Cherdak v. KoKo* case in the Summer of 2015 finally that Mr. McKirdy confirmed to Plaintiff in September, 2015 Mr. McKirdy's actual dealings with Koko and the fact that he had transferred key portions of the Assigned Technologies and related know-how and information to Koko in the course of actively assisting KoKo in improving and commercializing the allegedly infringing products and services.

38. Whether it be fair use, equitable estoppel, express or implied license or any other similar theory, Fitistics and Mr. McKirdy were hired and commissioned to transfer and deliver know-how contained within the Assigned Technologies to Koko during the summer of 2010, and Mr. McKirdy and Fitistics directly benefitted and were paid for their services and their deliverables. Mr. McKirdy and Fitistics did not have a written contract (e.g., a written consulting agreement or otherwise) with Koko and there was never an express contract or agreement concerning any reservation of rights benefitting or favoring Fitistics, or Mr. McKirdy in any way. To date, neither

Mr. McKirdy nor Fitistics (nor Koko) has ever produced a document containing any such reservation of rights and none was produced by them in response to subpoenas issued by Koko in discovery in the *Cherdak v. KoKo* case.  Mr. McKirdy's transfer of the Assigned Technology came at the express request by Koko to facilitate enablement of a commercially viable USB docking station for use in extracting exercise data from a cardio exercise machine and recording the same in encrypted form to a USB flash drive.  Proprietary Assigned Technology was transferred by Mr. McKirdy and Fitistics to Koko for monetary payment upon its express request.  Mr. McKirdy and Fitistics, in having no agreement with Koko for the delivery proprietary Assigned Technology belonging to Fitistics, intended and ensured that Koko would be able to freely use, copy, and distribute any and all otherwise proprietary Assigned Technology that Koko received. Mr. McKirdy directly worked with KoKo's head of software development in the Summer of 2010 (Mr. Charbel Elkhoury) and other Koko technical staff to disclose and deliver detailed information related to the Assigned Technologies so as to allow Koko to fix and enable its USB Docking Stations to be commercially viable and, more particularly, to be free of data dropping (data loss) issues and to be exercise machine agnostic as provided by the Assigned Technologies.  *See* **Ex. 5** (email thread between Mr. McKirdy at fitisitcs@gmail.com to Mr. Charbel Elkhoury exchanged prior to Mr. McKirdy being employed and paid by the KoKo entities to "fix" KoKo's computer software).  In **Ex. 5**, Mr. Elkhoury actually proposed that Mr. McKiry be provided with KoKo's USB Docking Station software so that Mr. McKirdy could make the necessary fixes to enable such software to facilitate commercially viable operation of KoKo's products.  *See Id.* -- Email from Mr. Charbel Elkhoury dated April 14, 2010 in which Mr. Elkhoury stated "I can share my code and you can make the appropriate fixes."  That's exactly what happened when Mr. McKirdy on behalf of himself and Fitistics was requested to attend meetings at KoKo's offices in which Mr.

McKirdy worked directly with Mr. Elkhoury and others to examine KoKo's computer software code so that Mr. McKirdy could "fix" or modify the same by delivering critical and central pieces of the Assigned Technologies – and Fititics  and Mr. McKirdy were paid for time and deliverables that Mr. McKirdy provided to Koko.

39.  In September, 2015, Mr. McKirdy expressly informed Cherdak that he had looked at and examined KoKo's confidential computer code when at the same time that he disclosed and revealed portions of the Assigned Technologies to facilitate enablement and modification of KoKo's hardware and software systems.  Mr. McKirdy's statements directly contradicted his earlier statements to Plaintiff that "I [Mr. McKirdy] never received any proprietary information." *See* **Ex. 3**.

40.  Shockingly, unbeknownst to Cherdak, on February 8, 2013, Mr. McKirdy sent an unsolicited email to Koko seeking their assistance with another case Fitisitcs brought against Mr. McKirdy's former employer, UNISEN, INC, and to introduce another one of Mr. McKirdy's companies, iScan2d, and to again offer to enter into business dealings about that entity's alleged technologies.  *See* **Ex. 15**.  In **Ex. 15**, Mr. McKirdy did not raise any issues or concerns with Koko continuing to use the Assigned Technologies that Mr. McKirdy had earlier transferred to KoKo in 2010, effectively three (3) years earlier.  Mr. McKirdy did not mention any threat of infringement of any patents (also assigned to Cherdak) or copyrights against Koko, assert any important information regarding the transfer of ownership in and to the Assigned Technologies to Cherdak. Mr. McKirdy (from a Fitistics email address to introduce yet another one of Mr. McKirdy's sham companies) merely wrote in pursuit of his own personal gain (to sell more of the Assigned Technologies and/or derivative works based thereon to KoKo now under the guise of his new entity known as "iScan2d") – again giving rise to an impression in the minds of KoKo that there

was never a conflict or dispute related to Koko using the key portions of the Proprietary Technologies that had earlier been transferred to Koko. Mr. McKirdy's misleading email to Koko was sent in bad faith as Mr. McKirdy was simultaneously urging Cherdak to pursue a patent and copyright infringement against Koko based on the Assigned Technologies. Mr. McKirdy's email of February 8, 2013 was produced by Koko support of the equitable estoppel defense that Koko had raised in the *Cherdak v. KoKo* case.

41. In the *Cherdak v. KoKo* case, Koko was able to make out strong defenses and claims under doctrines of equitable estoppel, fair use, express or implied license to use, copy and distribute the Assigned Technologies that were in fact delivered to Koko by McKirdy and Fitistics during Mr. McKirdy's and Fitistics' employment with Koko. *See* **Ex. 13**. In September of 2014, after over a year of protracted litigation in the *Cherdak v. KoKo* case, Mr. McKirdy delivered documentation to Cherdak showing that McKirdy had done work for KoKo, causing Cherdak significant concern about whether KoKo's defenses may be meritorious.

42. In the time period from December 2014 through January 2015, Koko offered settlement in the *Cherdak v. KoKo* case. Settlement was not reached in part based on the fact that Cherdak was operating on the basis that Mr. McKirdy initially stated that he had not provided any proprietary materials to Koko. Mr. McKirdy's statements were intentionally false and intended to mislead Cherdak. Cherdak informed Mr. McKirdy about KoKo's assertions of their defenses in litigation, and Mr. McKirdy denied having worked for the KoKo entities and instead insisting that such discussions with the KoKo entities were only patent licensing discussions. Mr. McKirdy's statements were knowingly false and misleading. Cherdak informed Mr. McKirdy in September, 2014 that working for Koko on the Assigned Technologies or competing technology was not disclosed to Cherdak prior to 2014 and that such a fact was a material one that would be a material

breach under the Assignment Agreements.  Cherdak also informed Mr. McKirdy that Cherdak would not have spent his time litigating the *Cherdak v. KoKo* case if McKirdy had in fact worked for the KoKo entities to assist them in building out the very accused products in the Cherdak v. KoKo case.  Cherdak had significant doubts about the merits of his claims against Koko going forward but was unable to reach settlement with Koko so the litigation continued.  Cherdak expressed to Mr. McKirdy that Cherdak was litigating the *Cherdak v. KoKo* case with a great risk of possible exposure to attorneys' fees exceeding likely more than several hundred thousands of dollars and the like if Koko were able to make out their defenses, especially those sounding in Equitable Estoppel, and that Koko could pursue a claim for vexatious litigation.  Despite Cherdak's good faith efforts to settle the *Cherdak v. KoKo* case, Koko pressed on in litigation in view of their counterclaims and defenses and KoKo asserted that it was going to be seeking attorneys' fees and the like.  Cherdak was locked into litigating expensive, time-consuming litigation.  Cherdak relied on Mr. McKirdy's assertions that would later prove untrue — especially as Mr. McKirdy and Fitistics assisted Koko (a target defendant identified by Mr. McKirdy) in improving and building out their CSAFE based products.

43. In late September, 2015, the parties in the *Cherdak v. KoKo* case again began discussing settlement.  Significant discovery had already taken place in that action at that time.  After Cherdak received certain information including, but not limited to, information related to Mr. McKirdy's employment with Koko in the summer of 2010 and Mr. McKirdy's invoice in **Ex. 13** hereto and other documents from Koko, Cherdak investigated the matter further with Mr. McKirdy.  In September, 2015, Mr. McKirdy revealed, for the first time, that he had in fact transferred to Koko key portions of and know-how embedded within the Assigned Technologies.  At no time earlier than late Summer 2015 had Mr. McKirdy revealed to Cherdak the fact or the material extent of

Mr. McKirdy's actual disclosure of key portions of the Assigned Technologies to Koko, including technology related to reliably obtaining exercise data from a cardio exercise machine in a particular sequence, formatting the same, encrypting the same, and recording the same to a USB flash drive – reliably and without dropping or losing data in the process.

44. Importantly, materials provided by Mr. McKirdy to Cherdak in September 2015 were sent by Mr. McKirdy *via* web-based storage facilities maintained by iScan2d.  In particular, Mr. McKirdy provided damaging documentation to Cherdak via a DROPBOX web facility maintained and owned by iScan2d.  *See* **Ex. 16**.  In the documents disclosed *via* iScan2d's DROPBOX in **Ex. 16**, Mr. McKirdy and Fitistics (and iScan2d) disclosed information allegedly belonging to Fitistics, to iScan2d and to Mr. McKirdy personally.  **Ex. 16** is repeated below to demonstrate that Mr. McKirdy regularly comingled Fitistics, LLC's, iScan2d's and his own personal information. iScan2d had no interest or stake in the *Cherdak v. KoKo* case or Cherdak had been unaware that iScan2d maintained property allegedly belonging to Fitistics.



45. Based on Mr. McKirdy and Fitistics disclosing at least key elements of the Assigned Technologies to Koko, Koko actually incorporated the same directly into its product offerings as evidenced through side-by-side comparisons of critical portions of the Assigned Technologies and computer code found on allegedly infringing devices in the *Cherdak v. KoKo* case.  For example, prior to Cherdak learning about the extent of disclosures by Mr. McKirdy and Fististic to KoKo, Koko had taken the material disclosed and provided to them by Mr. McKirdy and Fitistics and incorporated the same into their own products.  The example below (prepared in part by Mr. McKirdy) demonstrates that Koko took the proprietary Assigned Technologies provided by McKirdy to duplicate the ordering/sequencing of protocol command messages to request data from cardio exercise machines (a critical aspect of the Assigned Technologies) and to format the same in substantially similar ways for recordation onto a USB flash drive:



**Fig. 2 – Exemplary Code Comparison of Copyrighted Works
To KoKo Computer Code – Same Requests, Same Sequence, Same Data Recordation
(Mr. McKirdy helped in preparation of the graphic on which Fig. was made)**

46. The issuance of such computer code instructions to gather and extract exercise data from cardio exercise machines and the formatting, encryption and recordation of the same to a portable USB flash drive are essential elements of the Assigned Technologies that were delivered to Koko from Mr. McKirdy and Fitistics per an explicit request for the same from Koko.

47. In October through November of 2015, and after receiving evidence of and details pertaining to Mr. McKirdy's paid employment with the KoKo that clearly supported KoKo's defenses to patent and copyright infringement, Koko again invited settlement, but on very reduced terms from what it had originally offered in January, 2015.   In the October-November 2015 timeframe, Koko affirmatively asserted that it would be able to make out its equitable estoppel and copyright fair use and other defenses in the *Cherdak v. KoKo* case and that they would seek attorneys' fees against Cherdak if he did not agree to settlement at that time.   Koko asserted that, based on Mr. McKirdy's prior employment with Koko and the fact that Mr. McKirdy had in fact conveyed a reasonable belief in the minds Koko that they had paid for and received technical

information and copyrighted materials, Koko had nothing less than an implied license to use the Assigned Technologies, giving rise to an equitable estoppel. *See e.g.*, S*CA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 807 F.3d 1311, 1332 (Fed. Cir. 2015) (en banc) (The effect of equitable estoppel, for example, is "a license to use the invention that extends throughout the life of the patent.").

48. In October, 2015, Plaintiff contacted Mr. McKirdy and explained the problems created by Mr. McKirdy's prior work efforts on behalf of Koko and the high probability of an adverse outcome of litigation in the *Cherdak v. KoKo* case. Mr. McKirdy was advised by Cherdak about the details of a potential settlement between Cherdak and Koko, and Mr. McKirdy was provided with and participated in the drafting of a proposed draft settlement agreement. In January, 2016, when Plaintiff was reporting additional details to Mr. McKirdy, Cherdak wrote to Fististics and McKirdy and stated: "The problems associated with the Core [Industries, LLC] cases and the KoKo case arose, in large part, given your close connections to those entities…I cannot overemphasize the impact of your contracted status with KoKo as a play that Cooley threatened to make in the KoKo case." These warnings fell on deaf ears. In fact, in October, 2015, Mr. McKirdy asserted yet a different story about his and Fitisitics' transactions with Koko in the Summer 2010 timeframe, which was wholly unsupported by the documents produced in the Koko litigation. In Ex. 17, Mr. McKirdy, in a very hostile email, wrote to Cherdak and stated: "My conversations with Koko where I spoke about patents *were only related to Fitistics patents pending at that time. And they also were interested in a licensing the technology and the portfolio back then (I will swear that out on a declaration.")*. (emphasis supplied). Even in October, 2015, Mr. McKirdy could not face the truth of his disclosures to and work for Koko, of the fact that he executed an NDA to receive confidential/proprietary information from Koko, of the fact that he and Fitistics

30

agreed to work directly with Koko to help them fix their computer software with proprietary technology embedded in the Assigned Technologies for which Mr. McKirdy and Fitistics were paid, and of the fact that Mr. McKirdy had conveyed nothing less than a license to the Assigned Technologies that provided the basis for nothing less than equitable estoppel in KoKo's favor.

49. Given the fact that Mr. McKirdy and Fitisitics, LLC had in fact disclosed and delivered at least significant aspects of the Assigned Technologies to Koko creating equitable estoppel and a license for Koko, Cherdak had no choice but to settle the KoKo case on very unfavorable terms. The Cherdak-KoKo Settlement Agreement provided no license to Koko, but merely a release and settlement payment, and therefore did not trigger any obligations on the part of the Plaintiff that are owing to Defendant.

50. The Copyright Assignment Agreement is clear in terms of the express warranties that Fitistics made to Cherdak to induce him to enter into that contract. In particular, the Copyright Assignment Agreement states, *inter alia*, that Fitistics made representations and warranties as follows:

> 4. **The Assignor hereby represents and warrants to Assignee the following:**
>
> A. the Assignor has the right, power and authority to enter into this Agreement;
> B. the Assignor is the exclusive owner of all right, title, interest and all intellectual property rights in and to the Works;
> C. the Works are free and clear of any all liens, encumbrances or licenses that would in any way be inconsistent with the rights transferred herein;
> D. the Works do not infringe on the rights of any third party;
> E. there are no claims against the Works by any third party; and
> F. the Assignor is not subject to any agreement, whether written or otherwise, which would prevent the Assignor from having all right, power and authority to assign the Works and all rights in and to the Works as effected herein.

*See* **Ex. 1**. At a minimum Fitistics materially breached express warranties under the Copyright Assignment Agreement and, in particular, Express Warranty Items "B", "C," "E," and "F" as stated above. Fitistics encumbered and/or licensed key parts of the Assigned Technologies to Koko in ways that are inconsistent with the rights transferred to Cherdak under the Assignment Agreements

including, but not limited to, the right to pursue claims against suspected infringers. Fitistics and Mr. McKirdy knowingly created claims against the Assigned Technologies including those related to affirmative claims and defenses borne out of fair use, equitable estoppel, implied license, work-for-hire and all other available theories given Fitistics' and McKirdy's paid-for disclosures of the Assigned Technologies to Koko.   Fitistics and Mr. McKirdy were knowingly subject to agreements, written or otherwise, such as an implied license that prevented Fitisitics from having and conveying all right, power and authority to assign the Assigned Technologies and all rights in and to the copyrighted works as intended to be effectuated in the Copyright Assignment Agreement.

51. As a result of these material breaches of the Assignment Agreements, including the implied covenant of good faith and fair dealing, and their concealment of critical information from the Cherdak, Defendants caused significant, compensable harm to Cherdak. Cherdak relied on the express statements, averments, and manifestations of the Defendants that there was no cloud on title to the Fitistics Assigned Technologies, there were no agreements under which third parties could ever assert any form of encumbrance on title or any license or other theory grounded on equitable principles supporting a free and clear right to enjoy the Assigned Technologies and/or portions thereof. For example, and not by way of limitation, Cherdak relied on his alleged ownership of the Assigned Technologies to advance a claim against Koko for which Cherdak spent nearly two-thousand hours in an inconvenient jurisdiction (Boston, Massachusetts) spanning more than two years litigating patent and copyright infringement claims over technology for which Fitistics and Mr. McKirdy knew that they had earlier granted at least an implied license to Koko. Additionally, because of Fitistics' breaches of the Assignment Agreements, Cherdak gave up pursuing his own valuable intellectual property, namely, patents directed to exercise tracking and

wearable devices that expired in July 2013 after the Copyright Assignment Agreement was effectuated.  Based on Cherdak's prior licensing with regard to his own valid patents (patents for which Cherdak is the sole, named inventor), Cherdak directly lost out on licensing opportunities and Defendants knew that Cherdak would instead be spending his irreplaceable time pursuing *inter alia* patent and copyright infringement actions based on his acquired ownership of the Assigned Technologies.  Additionally, because of fraud and misrepresentations made before and after the effective date of the Assignment Agreements, Cherdak was harmed in settlement proceedings in the *Cherdak v. KoKo* case as Cherdak had to accept terms far less favorable than had been previously offered by Koko given the fact that Fitistics and McKirdy had previously taken action to convey nothing less than an implied license or other freedom to use the Assigned Technologies to Koko.  Cherdak is entitled to be compensated for his time, his lost business opportunities, and expenses that he incurred as direct and proximate results of Fististics' and McKirdy's breach of express warranties and representations made in the Copyright Assignment Agreement on which Cherdak reasonably relied, in addition to breaches of the implied covenants of good faith and fair dealing contained in both Assignment Agreements.

52. Fitistics and Mr. McKirdy alone and jointly had actual knowledge of their false and misleading statements especially in view of their intentional concealment of their relationships with and active assistance to targeted suspected infringers.  There misrepresentations were intentionally made out to deceive Cherdak into entering into and then performing the Assignment Agreements and to deceive the Cherdak into initiating and pursuing doomed and ultimately meritless litigation against others.  Such knowing falsity of their statements coupled with Fitistics and Mr. McKirdy' intentionally deceiving the Cherdak constituted actual malice sufficient and reckless disregard for the rights of Cherdak sufficient to support an award of punitive or exemplary

damages under Maryland law (the law to be applied by this Court relative to asserted breaches of the Assignment Agreements).

53. During discovery in the *Cherdak v. KoKo* case, Mr. McKirdy and Fitistics revealed for the first time that they had used the Assigned Technologies to build out another device and corresponding software system for another entity known as MYE, INC. Mr. McKirdy informed Cherdak in September, 2015 that MYE, INC. is using the same or substantially similar inventions and computer software that is embedded within the Assigned Technologies to facilitate a device that tracks workout metrics to gauge cardio exercise machine usage to drive maintenance and service arrangements related to fitness clubs and their fleets of cardio machines. Because the Assigned Technologies provide for use with any cardio exercise machine equipped with CSAFE communications abilities, Mr. McKirdy informed Cherdak that MYE's products are enabled by the same or substantially similar derivative software embedded in the Assigned Technologies. Although Fitistics and Mr. McKirdy ultimately advised Cherdak that Fitistics and Mr. McKirdy had licensed certain **patents** to MYE, INC., Fitistics and Mr. McKirdy did not advise the Cherdak that MYE, INC. has been using through license from Mr. McKirdy and at least Defendant iScan2d the very same and/or substantially similar software developed by and on behalf of Fitistics, and Mr. McKirdy and warranted by them to be exclusive to Cherdak in the Copyright Assignment Agreement. Cherdak did not learn about the details of MYE, INC.'s use of the Copyrighted Works and/or derivatives thereof until September, 2015 when Mr. McKirdy advised Cherdak of the same given attempts by Koko in the *Cherdak v. KoKo* case to take Mr. McKirdy's deposition. Under the terms of the Copyright Assignment Agreement and, in particular, the express warranties therein, Fitistics and Mr. McKirdy not only were duty-bound to advise Cherdak of any licenses or other encumbrances related to the actual software technologies encoded within the Copyrighted

Works as used by MYE, INC., but expressly represented and warranted that no such licenses had been given.  To date neither Mr. McKirdy or Fitisitcs has provided Cherdak with any agreement related to Fitistics' reservation of rights in and to software embodying the Copyrighted Works and -- the presence of these derivative works present in MYE, INC.'s products is a clear and material breach of the Copyright Assignment Agreement.

54. During Koko-related settlement negotiations in the October through November, 2015 timeframe, Mr. McKirdy revealed for the first time that Mr. McKirdy had intentionally concealed his ownership of certain patent/patent applications in an effort to shield those patent assets from being licensed under a Certain Confidential License and Settlement Agreement in the *Cherdak v. Core* case originally filed in this Court.  Mr. McKirdy revealed for the first time that he had assigned certain patents/patent applications to himself and/or other family members or other entities or individuals so that he could attempt to avoid licensing such assets to Core Industries, LLC and Koko.  In fact, further preventing settlement of the *Cherdak v. KoKo* case in January 2015 and further frustrating settlement of that case in October, 2015, was the fact that Mr. McKirdy refused to agree to allow Cherdak to make certain warranties concerning whether Fitistics and Mr. McKirdy (and his co-inventor, Mr. Robert Nutini) had assigned all patents/applications to Cherdak.  Mr. McKirdy refused to identify the patents/applications for which he orchestrated assignments.  Upon conducting a pre-filing investigation relative to this action, Cherdak learned that Mr. McKirdy had in fact transferred or assigned at least certain patent applications to himself in his personal capacity.  *See* **Ex. 18** (US Patent Application No. United States Patent Application 20130032631, WIPO Patent Application WO/2013/049281 – both assigned to Mr. McKirdy personally).  During settlement negotiations in the *Cherdak v. KoKo* case, Mr. McKirdy failed to mention that he had assigned certain patent/application assets to others in their individual

capacities.  Mr. McKirdy's failure and refusal caused Cherdak to engage in protracted litigation, to incur costs, to cope with stressful litigation and be harmed in compensable ways.  Importantly, it appears that Mr. McKirdy did not record certain assignments of patents/applications at the Assignment Branch of the USPTO.  McKirdy and Fitistics, knowing that these other applications and secret assignments devalued the Assigned Technologies, intentionally concealed, lied about and failed to disclose them to Cherdak during the negotiation of the Patent Assignment Agreement, which Cherdak would not have signed had he known about them, because they made it much more difficult to obtain license agreements which do not include potentially patentable improvements and variations on the Assigned Technologies.

55. The Warranty demanded of Cherdak by the KoKo entities read as follows:

> "Fitistics, Inc., Sean McKirdy and/or Robert Nutini have, prior to the Effective Date of this Agreement, transferred to Cherdak ownership of all intellectual property rights owned by them at any time prior to the Effective Date of this Agreement that claim or relate to the Field of Use"

Cherdak could not make the foregoing representation given Mr. McKirdy's transfers of patents/application.   Mr. McKirdy refused to allow Defendant to make out such a representation/warranty because Mr. McKirdy knew that he had not assigned all intellectual property that related to exercise data gathering and tracking.

56. Mr. McKirdy refused to provide information that was otherwise unavailable to Cherdak.  Because Cherdak could not agree to the terms demanded for settlement, litigation proceeded and Mr. McKirdy knowingly compelled Cherdak to pursue litigation that exposed him to damages for allegedly asserting vexatious litigation.  Mr. McKirdy intentionally frustrated and multiplied litigation activities by creating a situation where he had previously engaged in transfers of certain intellectual property rights that frustrated Cherdak's licensing and litigation activities which were the basis of the bargain underlying the Assignment Agreements.

57. After Mr. McKirdy and iScan2d provided discovery documents to Cherdak during discovery in the *Cherdak v. KoKo* case, Mr. McKirdy informed Cherdak that the central technologies related to issuing and receiving cardio exercise machine data from CSAFE data communications protocol requests as embodied within the Assigned Technologies (*See* Fig. 1, above), were included in certain software and products being licensed by iScan2d to the likes of MYE, INC., LANDICE, and CYBEX.  In fact, Mr. McKirdy informed Cherdak that MYE, INC. offers a CSAFE based docking station that incorporates many of the modules in Fig. 1 and/or derivative works based thereon. On Mr. McKirdy's current LINKED-IN page, Mr. McKirdy states that his iSCAN2d entity that is "[a]ctively licensing rights to OEM's for machine diagnostic ***and workout tracking***." *See* Ex. 19.  Iscan2d operates out of Mr. McKirdy's residence.  *See* **Ex. 20** (Connecticut Business Records).  Because Mr. McKirdy heads both iScan2d and Fitistics, Mr. McKirdy and his iScan2d entity are and were aware of the Copyright Assignment Agreement and the rights that Cherdak has thereunder to be the exclusive licensor related to the Copyrighted Works in the exercise tracking marketplace.  Mr. McKirdy is currently advertising that he is the Founder and CEO of iScan2d.  *See* **Ex. 19**.  All of this violates the terms of the Copyright Assignment Agreement and infringes Mr. Cherdak's copyrights in the Assigned Technologies.

58. Because iScan2d is "actively licensing rights to OEMs for machine diagnostic and ***workout tracking***" based on Copyrighted Works included in the Assigned Technologies that were assigned to and are owned by Cherdak, neither Mr. McKirdy or iScan2d has the right to distribute or license these products or software to companies like MYE, INC., LANDICE, or CYBEX. Mr. McKirdy and iScan2d have no rights in any material contained in the Copyrighted Works or Assigned Technologies, and, to date, Mr. McKirdy has never provided any form of documentation relaying such rights from Fitistics to iScan2d or to others while they were owned by Fitistics,

which also would put Fitistics in breach of the Copyright Assignment Agreement representations and warranties.

59. iScan2d's current website indicates that iScan2d is actively licensing to CYBEX, LANDICE and MYE, INC.  Such licensing efforts have been knowing interferences with and breaches of Cherdak's rights under the Copyright Assignment Agreement in that such efforts have stripped Cherdak of valuable opportunities to license the Assigned Technologies to exercise tracking to OEMs.  *See* **Ex. 19**.  Such active licenses substantially interfere with Cherdak's ability to license OEMs, which was the core purpose of the Assignment Agreements.  For example, MYE, INC. manufacturers and markets a data tracking device that incorporates at least substantial portions (csafe.c as shown in Fig. 1 above – or derivations thereof) of the Assigned Technologies and/or derivations thereof to gather and collect exercise data from cardio exercise machines.  In January 2014, Mr. McKirdy *via* a Fitistics email informed Cherdak that MYE was ***planning*** to build a website and products for data tracking.  *See* **Ex. 22** (Mr. McKirdy writing "There is a USB port on the case module that they [MYE, INC.] they are building.").  In September, 2015 and per a demand for Mr. McKirdy's deposition in the *Cherdak v. KoKo* case, Mr. McKirdy informed Cherdak that the MYE, INC. had developed a commercial product that is a "csafe module" that actually incorporated substantial elements contained in the Assigned Technologies that were provided to MYE, INC. from Fitistics and Mr. McKirdy and iScan2d.  The MYE, INC. products are no less than derivative and infringing works based on the Assigned Technologies.  In fact, MYE, INC.'s product and the original Fitistics docking station based on the Assigned Technologies are remarkably and substantially similar.

60. Furthermore, Cherdak has learned that Mr. McKirdy and Fitistics and iScan2d Technologies, LLC have apparently permitted another one of Mr. McKirdy's alter-ego

"companies" by the name of Fitness Device Technologies, LLC – also operated out of Mr. McKirdy's residence, to be a licensing agent related to technologies encoded and embodied within the Assigned Technologies.  *See* **Ex. 20** (Connecticut Business Records).

61. Fitness Device Technologies, LLC represents as follows on its website:

> FDT can create a unique gym franchise model that is centered around technology in the gym that will let members track all of their workout information using any smartphone. **We have a license on technology for exercise machine data tracking to smartphones from iScan2D Technologies, LLC (www.iscan2D.com).**

*See* **Ex. 21**.

62. Any licenses or distribution of any copyrighted material contained within the Assigned Technologies by any entity other than the Cherdak is unauthorized, infringing and unlawful and has been done willfully and with knowing disregard for the rights transferred to the Cherdak in the Assignment Agreements.   Such wrongful conduct is nothing less than double-dealing that constitutes willful copyright infringement.

63. The following facts support Cherdak's claim for copyright infringement against Defendants Fitistics, McKirdy (in his individual capacity) and iScan2d.  In fact, Mr. McKirdy was involved in double dealing.  On one hand, Fitistics, solely through Mr. McKirdy, assigned the Assigned Technologies to Cherdak.  On the other hand, Fitistics, solely through Mr. McKirdy, purported to own and license the Assigned Technologies and proceeded to transfer the software embedded in those Copyrighted Works to iScan2d (and then to its customers) and possibly others for the sole purpose of distributing, licensing, copying and creating derivative and infringing works used for exercise data gathering and tracking.

64. iScan2d, under Mr. McKirdy's direction, copied and/or developed and/or licensed development of unauthorized derivative works transferred under license to entities including, but not limited to, MYE, INC. and others.  On information and belief, Mr. McKirdy has used the same

software and product development team, ESI Electronics in Connecticut, to assist others in the development of derivative works based on the original Assigned Technologies that were assigned to Cherdak by way of the Assignment Agreements.

65. iScan2d is actively licensing MYE, INC., LANDICE, and CYBEX relative to CSAFE data retrieval products used with cardio exercise machines.  On information and belief, iScan2d has developed or overseen development of a CSAFE based exercise data gathering device suitable for gathering exercise data from cardio exercise machines.  On the iScan2d website, iScan2d boasts of its CSAFE data gathering product and shows and describes the same as follows:

> Proprietary iScan2D technology is also available for fitness equipment manufacturers to embed or integrate into their cardio machine screens. Simple software licensing for workout/service QR codes, CSAFE WiFi module, or complete embedded solutions.



66. In **Ex. 22**, Mr. McKirdy wrote to Cherdak from his Fitistics account to describe such WIFI modules as follows:

> This link shows the website MYE is building for the machine diagnostics system that *is based off the csafe software*.  There is a USB port on the csafe module that they are building.  This module will have the ability to periodically request data from the machine every 30 seconds and send data machine data to a pc in a gym.  The pc will have software the Conquest is building right now that will send the data at night to the website.

67. Clearly, Mr. McKirdy collected copies of the Assigned Technologies and the software embedded therein -- software and Copyrighted Works that were wholly and fully assigned along

with the sole and exclusive right to make derivative works thereof.  Cherdak never authorized Mr. McKirdy, iScan2d or Fitistics to make derivative works and Mr. McKirdy, iScan2d and Fitistics do not have the right to license others to use, copy, or otherwise enjoy the Copyrighted Works or Assigned Technologies and/or to make unauthorized derivative works.

68. Mr. McKirdy's email in which he wrote that MYE, INC.'s cardio machine diagnostics systems "is based off the csafe software" is a direct admission of Fitistics' and Mr. McKirdy's creation of unauthorized derivative works infringing upon Cherdak's copyrights in the Assigned Technologies.  In fact, MYE, INC. has built additional products as part of its cardio exercise machine management lineup.  Such management products incorporate USB docking stations that are based on an unauthorized derivative work "based off the csafe software" embedded and encoded within the Copyrighted Works and Assigned Technologies that were assigned to the Cherdak in the Assignment Agreements.

69. Only Cherdak has the sole and exclusive right to enforce the Copyrighted Works and Assigned Technologies, whether through litigation or to license the same in transactional arrangements.  Defendants McKirdy, Fitistics, and iScan2d are absolutely aware of those facts and have been at all relevant times.

70. Because Mr. McKirdy runs both Fitistics and iScan2d, and because there is unity of ownership between Mr. McKirdy and Fitistics and iScan2d, and because Mr. McKirdy has used his numerous entities as different hats to wear depending on his intentions to gain at least an unfair advantage over Cherdak and to defraud and mislead him, no corporate veil can protect Mr. McKirdy from personal liability associated with his and his entities' willful copyright infringement.  Mr. McKirdy, Fitistics and iScan2d are alter egos of one another.

71. Mr. McKirdy knew that the Copyrighted Works and Assigned Technologies were fully and wholly assigned to the Cherdak regardless of the entity that Mr. McKirdy has allowed to unlawfully license copies and/or derivative works. Such unlawful licensing and allowance granted to third parties such as MYE, INC. constitutes copyright infringement under the U.S. Copyright Act for which Cherdak is entitled to elect either actual or statutory damages prior to trial. And, because such copyright infringement has been willful especially as Mr. McKirdy should have known better as he can have no justifiable reason that engaged in double-dealing to allow others to use Copyrighted Works assigned to Cherdak and to intentionally strip Cherdak of the ability to license others which was the core goal and the basis of the bargain agreed to in the Assignment Agreements. Mr. McKirdy knew that when he allowed Fitistics. and iScan2d to license others to make unauthorized derivative works, he was committing nothing less than willful copyright infringement and breaching the implied covenant of good faith and fair dealing in the Assignment Agreements (as well as their express terms). After all, Mr. McKirdy worked with Cherdak in drafting the Assignment Agreements.

## COUNT I
## BREACH OF CONTRACT – BREACH OF EXPRESS WARRANTY
## (ALL DEFENDANTS)

72. Paragraphs 1-71 are hereby incorporated by reference as if restated herein.

73. The Agreements are valid and enforceable contracts on which Cherdak detrimentally relied and under which Cherdak fully performed up to the time of Defendants' first and prior material breaches. Cherdak performed and satisfied all conditions precedent. Defendants have materially breached the Assignment Agreements in ways that are actionable and compensable at this time. Cherdak has suffered and is entitled to recover no less than $3 Million Dollars in actual compensatory damage for his time spent, lost business opportunities and profits, realization of reduced settlement values, realization and of costs and debts incurred in relation to pursuing claims

for copyright and patent infringement against other entities given the fact that Defendants intentionally concealed their grant of nothing less than an express or implied license in and to the Assigned Technologies to others without informing Cherdak of those licenses and/or other facts that ran afoul of the affirmative rights conveyed to Cherdak under the Assignment Agreements.

74.     Defendants violated and breached the express and implied terms of the Assignment Agreements, including without limitation the implied covenant of good faith and fair dealing and express representations and warranties, by falsely misrepresenting that they had not licensed or encumbered the Assigned Technologies, by infringing the patents and copyrights in the Assigned Technologies, by providing third parties with the Assigned Technologies and with licenses to the Assigned Technologies owned by Cherdak, and by assigning related persons and companies with related improvement and continuation patents and applications the existence of which they had concealed from and falsely denied to Cherdak.   Defendants, as alter egos of one another, are jointly and severally liable for Cherdak's damages.

WHEREFORE, Cherdak is entitled to recover from Defendants, jointly and severally, actual compensatory damages in an amount estimated at $3 million.   Cherdak also is entitled to reasonable attorneys' fees, costs of suit, pre-judgment interest, and post-judgment interest.


### COUNT II
### FRAUD
### (AGAINST ALL DEFENDANTS)

75.  Paragraphs 1 through 75 are hereby incorporated by reference as though expressly set forth herein.

76.   Defendants committed actual fraud against Cherdak which fraudulently induced the making of, and which fraudulently induced Cherdak's performance and continued performance of, his litigation, licensing and enforcement efforts under the Assignment Agreements.

77.   Defendants through Mr. McKirdy knowingly and intentionally made false misrepresentations to Cherdak and concealed material facts from him intending that he would rely upon their misrepresentations and concealments to enter into and perform the Assignment Agreements.   Cherdak actually and reasonably relied on Defendants' misrepresentations and concealments by entering into and performing the Assignment Agreements, putting in thousands of hours of time and effort to earn a small fraction of the revenues he would have earned and derived had Defendants not disseminated the Assigned Technologies to competitors and potential infringers, had Defendants not encouraged and assisted competitors in developing infringing software and products, and had Defendants not misrepresented and concealed their assignment of continuation and related patents and applications to related persons and entities.   Such knowingly false misrepresentations were material related to the essence of the Assignment Agreements – to enable Cherdak to successfully advance and monetize claims for patent and copyright infringement against third party infringers who were supposed to have possessed no rights in or to the Assigned Technologies and/or key and substantial elements thereof.   Defendants' statements were intentionally made so as to be relied upon by the Cherdak in entering into and performing the Assignment Agreements.   Cherdak only confirmed Defendants' intentionally false and misleading statements in the September to October 2015 timeframe, and Cherdak had no way of discovering such falsity until that time.   Defendant's false and misleading statements and material omission were in fact relied upon by the in entering into and continuing to perform the Assignment Agreements, and Cherdak was injured and harmed in compensable ways as result, including

diminished licensing and litigation revenues, thousands of hours of lost time and litigation effort, and having foregone more lucrative business opportunities.

78.   Defendants' conduct was willful and malicious and they defrauded Cherdak intentionally, willfully and maliciously and with a reckless disregard for his rights.   Therefore, Cherdak is entitled to actual damages in an amount estimated at $3 million and an additional $1 million in punitive or exemplary damages.      Because each Defendant is the alter ego of one another, each Defendant is jointly and severally liable for Cherdak's damages.

WHEREFORE, Cherdak is entitled to recover from Defendants, jointly and severally, actual compensatory damages in an amount estimated at $3 million.   Cherdak also is entitled to reasonable attorneys' fees, costs of suit, pre-judgment interest, and post-judgment interest.

## COUNT III
### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST DEFENDANTS MCKIRDY & ISCAN2D)

79.   Paragraphs 1 through 71 are hereby incorporated by reference as if restated herein.80. Defendants' have known about the Assignment Agreements and their terms since their inception and have known about and suggested to Cherdak the most likely potential target licensees who used similar and suspected infringing products.   Nevertheless, Defendants intentionally and improperly, contrary to the Assignment Agreements and through infringing the copyrights and patents in the Assigned Technologies, interfered with Cherdak's licensing and settlement agreements with the reasonably anticipated revenues therefrom.

81.   Defendants are actively marketing, selling and distributing products and software directed toward mutually identified target OEMs of cardio exercise machines that involve the transfer and distribution of copyright and patent infringing technologies in the Assigned Technologies.   Defendants are actively licensing and distributing and holding themselves out as

having the ability to license and distribute products and software that include the Assigned Technologies but which infringe the patents and copyrights embodied therein. 82. Defendants have no right to distribute or license the Assigned Technologies.

82.   Defendants' infringing conduct interferes with Cherdak's rights under the Assignment Agreements in addition to infringing Cherdak's copyrights in the Assigned Technologies.   It further disrupts and interferes with Cherdak's rights to settle with, license and obtain revenues from the target OEM's and licensees.

83.   Defendants' conduct was willful and malicious and they tortiously interfered with Cherdak's agreements, licensing arrangements, and settlement prospects intentionally, willfully and maliciously and with reckless disregard for his rights.   Therefore, Cherdak is entitled to actual damages in an amount estimated at $3 million and an additional $1 million in punitive or exemplary damages.   Because each Defendant is the alter ego of one another, each Defendant is jointly and severally liable for Cherdak's damages.

WHEREFORE, Cherdak is entitled to recover from Defendants, jointly and severally, actual compensatory damages in an amount estimated at $3 million and punitive or exemplary damages in the amount of $1 million.   Cherdak also is entitled to reasonable attorneys' fees, costs of suit, pre-judgment interest, and post-judgment interest.

**COUNT IV**
**COPYRIGHT INFRINGEMENT**
**(AGAINST ALL DEFENDANTS)**

84. Paragraphs 1 through 72 are hereby incorporated by reference as if restated herein.

85.   Cherdak is the rightful owner of the Copyrighted Works and the Copyright Registrations specified in this Counterclaim, which are part of the Assigned Technologies obtained by Cherdak through the Assignment Agreements.

86.   Defendants have engaged in copyright infringement by copying, distributing and licensing unauthorized copies and unauthorized derivative works consisting of products and software infringing the copyrights in the Assigned Technologies and Copyrighted Works.

87.   Defendants have engaged in exceptional, intentional and willful infringement of Cherdak's copyrights in violation of the U.S. Copyright Act. 17 U.S.C. § 504(c)(2).  Defendants knew that Cherdak is and was the sole owner of all copyrights in the Copyrighted Works and Assigned Technologies when Defendants intentionally infringed them.

88.  Defendants' copyright infringement was part of their double-dealing by which they led Cherdak to believe he was obtaining exclusive rights to enforce and license while they had been or were widely disseminating the Assigned Technologies to the industry and to key target licensees identified and selected by Defendants.

89.   Cherdak has suffered and is entitled to damages and to obtain injunctive relief related to Defendants' wrongful conduct.  Cherdak is entitled to damage including electable actual or statutory damages under the U.S. Copyright Act.  Because Defendants' copyright infringement is no less than willful, intentional and exceptional Cherdak is entitled to the full statutory enhancement of damages of no less than $150,000.00.

90.   Defendants' copyright infringement was intentional, willful and malicious making this a willful and exceptional case of copyright infringement.  Therefore, Cherdak is entitled to actual damages in an amount estimated at $3 million in addition to treble, punitive or exemplary damages and attorneys' fees as permitted by the Copyright Act in cases of willful and exceptional copyright infringement.   Because each Defendant is the alter ego of one another, each Defendant is jointly and severally liable for Cherdak's damages.

WHEREFORE, Cherdak is entitled to recover from Defendants, jointly and severally, actual compensatory damages in an amount estimated at $3 million and treble, punitive or exemplary as permitted by the Copyright Act in cases or willful, intentional and exceptional infringement.  Cherdak also is entitled to reasonable attorneys' fees, costs of suit, pre-judgment interest, and post-judgment interest.

### COUNT V
### NEGLIGENT MISREPRESENTATION AND CONSTRUCTIVE FRAUD
#### (Against All Defendants)

90.  Paragraphs 1 through 71 are hereby incorporated by reference as though expressly set forth herein.

91.   Defendants committed constructive fraud and negligent misrepresentation against Cherdak which fraudulently induced the making of, and which fraudulently induced Cherdak's performance and continued performance of, his litigation and licensing efforts under the Assignment Agreements.

92.      Defendants through Mr. McKirdy negligently and carelessly made false misrepresentations to Cherdak and concealed material facts from him intending that he would rely upon their misrepresentations and concealments to enter into and perform the Assignment Agreements.   Cherdak actually and reasonably relied on Defendants' misrepresentations and concealments by entering into and performing the Assignment Agreements, putting in thousands of hours of time and effort to earn a small fraction of the revenues he would have earned and derived had Defendants not disseminated the Assigned Technologies to competitors and potential infringers, had Defendants not encouraged and assisted competitors in developing infringing software and products, and had Defendants not misrepresented and concealed their assignment of continuation and/or related patents and applications to related persons and entities.   Such

negligently and carelessly false misrepresentations were material related to the essence of the Assignment Agreements – to enable Cherdak to successfully advance and monetize claims for patent and copyright infringement against third party infringers who were supposed to have possessed no rights in or to the Assigned Technologies and/or key and substantial elements thereof. Defendants' statements were intentionally made so as to be relied upon by the Cherdak in entering into and performing the Assignment Agreements.   Cherdak only confirmed Defendants' negligently and carelessly false and misleading statements in the September to October 2015 timeframe, and Cherdak had no way of discovering such falsity until that time.  Defendant's false and misleading statements and material omission were in fact relied upon by Cherdak in entering into and continuing to perform the Assignment Agreements, and Cherdak was injured and harmed in compensable ways as result, including diminished licensing and litigation revenues, thousands of hours of lost time and litigation effort, and having foregone more lucrative business opportunities.

93.  Defendants' conduct was negligent and careless and they defrauded Cherdak with a willfully and wantonly negligent disregard for his rights.  Therefore, Cherdak is entitled to actual damages in an amount estimated at $3 million and an additional $1 million in punitive or exemplary damages.   Because each Defendant is the alter ego of one another, each Defendant is jointly and severally liable for Cherdak's damages.

WHEREFORE, Cherdak is entitled to recover from Defendants, jointly and severally, actual compensatory damages in an amount estimated at $3 million.   Cherdak also is entitled to reasonable attorneys' fees, costs of suit, pre-judgment interest, and post-judgment interest.

**DEMAND FOR JURY TRIAL**

Cherdak hereby demands trial by jury on all issues so triable.


Respectfully Submitted This 29th Day of April, 2016 By:

Erik B. Cherdak

By: /s/Michael C. Whitticar
Counsel

Michael C. Whitticar (VSB No. 32968)
NOVA IP Law, PLLC
7001 Heritage Village Plaza, Suite 205
Gainesville, VA 20155
Tel: (571) 386-2980
Fax: (855) 295-0740
Email: mikew@novaiplaw.com
*Counsel for Counterclaim Plaintiff Erik B.*
*Cherdak*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29th, 2016, I filed this *Counterclaim* and *Certificate* with the

Clerk of the Court using the United States District Court CM/ECF System and that a copy of said

documents will be provided to the following counsel of record via the CM/ECF System:

John D.V. Ferman
Birch Stewart Kolasch & Birch, LLP
8110 Gatehouse Road, Suite 100 East
Falls Church, VA 22042
Tel: (703) 205-8009
Fax: (703) 205-8050
Email: John.D.V.Ferman@bskb.com
*Counsel for Counterclaim Defendant Fitistics, LLC.*

*/s/ Michael C. Witticar*
Michael C. Whitticar