IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| FITISTICS, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> ERIK B. CHERDAK, <br><br> *Defendant*. | Case No. 1:16-cv-112-LO-JFA <br> Consolidated with 1:17-cv-500 |

## MEMORANDUM OPINION

This matter comes before the Court after a three-day bench trial from April 30, 2018 to May 2, 2018.[1] The parties have submitted post-trial briefs and oppositions thereto and the claims and counterclaims in this case are now ripe for disposition.

For the reasons that follow and for good cause shown at trial, the Court finds in favor of Fitistics, LLC and Sean McKirdy and against Erik Cherdak on all claims and counterclaims in this case. Fitistics will be awarded relief as described below and in the accompanying Order.

### I. Preliminary Matters

Several preliminary matters must be addressed.

First, Erik Cherdak has asked the Court to take judicial notice of Exhibit B to Docket Entry 111-5. His request is unopposed and the Court, finding good cause, so notices and makes Docket Entry 111-5, Exhibit B a part of the trial record. Fitistics has similarly asked for judicial notice of Plaintiff's Exhibit 8. Again, the Court finding good cause, so notices and makes Plaintiff's Exhibit 8 a part of the record.

---

[1] The Court afforded the parties equal time to try their cases and the trial concluded before the end of the day on May 2, neither party having pushed up against their afforded time.

Next, the Court has reviewed Erik Cherdak's post-trial briefs appearing at Docket Entries 347 and 348 and finds that neither conforms to Local Rule 7, employing extensive single spacing, reduced margin sizes, and reduced font sizes. The Court struck Erik Cherdak's first post-trial brief for these same reasons and cautioned Cherdak at the time that "if either his re-filed post-trial brief or his response brief . . . do not conform with the Local Rules and this Court's May 22, 2018 Order, they will be stricken and the Court will unlikely grant leave to re-file." Dkt. 346. Fitistics, in its opposition to Cherdak's post-trial brief, brings to the Court's attention a prior instance when Cherdak was cautioned by the District Court for the District of Massachusetts for similar violations in 2015. Given this Court's earlier explicit warning, the Court **ORDERS** Cherdak's briefs appearing at Docket Entries 347 and 348 **STRICKEN**.[2]

Finally, the Court must address Cherdak's *pro se* status. Cherdak has been represented in this case by eight prior attorneys, all of whom have withdrawn. The Court approved the withdrawal of Cherdak's most recent counsel over Cherdak's objections, after a sealed hearing on the matter on January 26, 2018. Cherdak had ample time to secure counsel between January 26 and trial, but he instead chose to represent himself *pro se*. Cherdak is a trained attorney who has litigated cases before this very Court in the past. He stated on the record that he has an inactive bar admission in Pennsylvania, and was recently employed by a top international law firm. Accordingly, the Court finds that Cherdak is not entitled to the consideration normally afforded to *pro se* parties who lack familiarity with the law, the court system, and its policies and procedures. *See Tatten v. City and Cnty. of Denver*, 730 F. App'x. 620, 625 (10th Cir. 2018) (collecting cases declining to extend special consideration to attorneys proceeding *pro se*).

---

[2] The striking of these filings does not impact the Court's consideration of the relevant law or of the facts adduced at trial.

## II. Introduction and Procedural History

Fitistics LLC ("Fitistics"), a Connecticut company, commenced this litigation on February 4, 2016, alleging breach of contract, breach of fiduciary duty, conversion, and fraud against Erik Cherdak ("Cherdak"). Cherdak counter-claimed for breach of contract, fraud, intentional interference with contractual relations and prospective economic advantage, copyright infringement, negligent misrepresentation, and constructive fraud. Judge Gerald Bruce Lee granted summary judgment in Cherdak's favor on Fitistics's breach of fiduciary duty claim and set a trial date of December 6, 2015. Dkt. 82. On December 5, 2015, Cherdak filed a Suggestion of Bankruptcy in the case file. Dkt. 155. Cherdak's attorney of the moment filed a motion to withdraw the same day. Dkt. 156. The next day, Judge Lee stayed this matter pending disposition of Cherdak's bankruptcy proceeding. Dkt. 159.

Notwithstanding the stay and his bankruptcy, on April 28, 2017, Cherdak filed suit against Fitistic's Chief Executive Officer, Sean McKirdy ("McKirdy"), and Fitistics related to the same issues in Cherdak's counterclaim, adding a new defamation claim against McKirdy. *See* 1:17-cv-500. Cherdak's use of the bankruptcy proceeding as a shield against liability while continuing to prosecute his own claims resulted in Fitistics obtaining relief from the stay in the bankruptcy court and, ultimately, in Judge T.S. Ellis's[3] consolidation of the two cases on September 25, 2017. Dkt. 194. Judge Ellis then set the case for trial on December 18, 2017. This date was subsequently changed to January 30, 2018. On January 12, 2018, Judge Ellis recused himself and the undersigned assumed responsibility over the case, setting the trial for April 30, 2018.

---

[3] Judge Lee having retired.

## III. Findings of Fact

At trial, the parties established the following facts.

In the spring of 2012, Fitistics, LLC held a patent portfolio pertaining to the retention and transfer of fitness data from fitness machines. The portfolio included U.S. Patent Number 8,118,709 (the '709 patent), which claimed priority from provisional application number 60/872,203 (filed 12/1/2006) and issuing from application number 11/998,766 (filed 11/30/2007). The portfolio also included patent applications 13/305,788 and 13/350,790 (later developed into a patent), both filed 1/15/2012 and were originally being prosecuted by Fitistics's attorney Steve McHugh.

In April 2012, Fitistics engaged Ward & Ward PLLC for legal services pertaining to its patent portfolio. Eric Cherdak was also a client of Ward & Ward, was previously licensed to practice law, and was presently a registered patent practitioner at the United States Patent and Trademark Office (USPTO). On April 9, 2012, Ward & Ward and Fitistics entered into an engagement letter, which makes no mention of Cherdak. PTX 35. That engagement letter for patent prosecution and preparation services contemplated, as compensation for those services, assigning a 25% ownership interest in Fitistics's patents, not including the '709 patent, which had already been issued. This assignment would be made to "a corporate or other legal entity of Lawyers' choosing." No such assignment ever occurred. Subsequent to this engagement letter, Ward & Ward and Fitistics, by addendum, agreed that Cherdak would have no involvement, directly or indirectly, with Ward & Ward legal services to Fitistics. PTX 37.

Separately, Cherdak, through Ward & Ward, was asked to help prosecute Fitistics' patent portfolio, specifically U.S. Patent Application Numbers 13/507,877, 13/507,876, 13/507,875, and 13/506,781. The evidence demonstrated that Cherdak did not perform any work on the '788

4

and '790 applications through Ward & Ward. The evidence also demonstrated that Cherdak routinely reassured Fitistics and Ward & Ward that he was handling patent prosecution for these applications, including paying required fees to the USPTO, yet all the applications ended up abandoned.

The engagement letter was novated in September 2012, backdated by agreement to March 3, 2012. PTX 36. On October 4, 2012, that novation was modified at the request of Ward & Ward to explicitly preclude Cherdak's involvement in Ward & Ward's work for Fitistics.

Fitistics independently entered into a Copyright Assignment Agreement (CAA) with Cherdak in December 2012, which Cherdak drafted and which provided for 65% of proceeds from those copyrights going to Fitistics and 35% going to Cherdak. PTX 45. This assignment enabled Cherdak to file a copyright infringement suit against Core Industries, Inc. in this Court in January 2013.

In his work leading up to the CAA, Cherdak used his expertise in computer science to parse the code written for Fitistics by ESI, a contracted vendor, and drafted copyright registration applications and assignments of rights in the code from ESI to Fitistics. *See* PTX Nos. 55, 81, 84; Tr. 4/30/18 at 49-50, 53-57, 65-67, 179, 183, 192-194, 202-203, 202-203, 217-218.

Cherdak successfully negotiated settlements with Core Industries and Koko Fitclub pursuant to his assignment under the CAA for a total of $130,000. Under the express terms of the CAA, Fitistics was entitled to $84,500 from these settlements. Cherdak sent a check to Fitistics for $42,000, but then placed a stop payment on that check and blamed the banks for the problems, alternatively inflating his litigation expenses in the Core Industries case and denying he owed any money under the Koko Fitclub settlement. PTX 27, 42, 83; Tr 4/30/18 at 118-121, 124-126, 153-155; Cherdak Dep. 7/25/16 at 387.

In July 2013, Cherdak entered into a patent license agreement with Garmin International, Inc. ("Garmin"), licensing, for $90,000, Fitistics's patent portfolio without Fitistics's knowledge and unrelated to the CAA. PTX 11-14. Cherdak had no legal right to Fitistics's patent portfolio at that time. *See* PTX 8, 9, 120. Yet Cherdak was plainly aware that the licensing agreement with Garmin covered Fitistics's portfolio. *See* PTX 11. Cherdak did not disclose to Fitistics the existence of this license and has never paid to Fitistics any part of the $90,000 he received from Garmin.

On August 12, 2013, Cherdak and Fitistics entered into a Patent Rights Assignment Agreement (PRAA), drafted by Cherdak. PTX 7. On August 11, 2013, apparently in an attempt to give legal enforceability to his still-concealed agreement with Garmin, Cherdak induced Fitistics to agree to backdate the PRAA to June 15, 2013, alleging, nonsensically, that backdating would bolster Cherdak's position in future lawsuits under the PRAA. *See* PTX 6, 7, 4/30/18 Trial Tr. at 101-102.

While the PRAA did not mention the Garmin license, due to Cherdak's continued concealment of that license from Fitistics, it plainly contemplated that other licenses had been entered into. It made explicit mention of existing licenses to MYE and Core Industries. PTX Nos. 1, 4, 7; 4/30/18 Trial Tr. at 91, 95-96, 104-106.

After entering into the PRAA, Cherdak licensed Fitistics's patent portfolio to Hanger, Inc. for $100,000 (PTX 80); Virgin Pulse, Inc. for $50,000 (PTX 18); Kersh Risk Management, LLC for $14,062.50 (PTX 22); Starwood Hotels and Resorts Worldwide, Inc. for $20,000 (PTX 23); Life Fitness/Brunswick Corp. for $100,000 (PTX 24); Technogym USA Corp. for $30,000 (PTX 26); Aliphcom, doing business as Jawbone for $25,000 (PTX 25); Johnson Health Tech

Co., Ltd., doing business as Matrix for $40,000 (PTX 19); Google for $15,000 (PTX 20)[4]; and Blue Cross and Blue Shield for $40,000 (PTX 79). Collectively, these licenses, the Garmin settlement and license, and the Core Industries and Koko Fitclub settlements will be referred to as the Licenses.

The Virgin, Starwood, Life Fitness, Tehcnogym, Johnson, and Koko license agreements all expressly granted rights to the Fitistics patent portfolio. See PTX 18-19, 23-26. The remaining license agreements can only be read to do the same. See, e.g., PTX 22 (licensing "any and all . . . patents that Cherdak now owns or may in the future own); PTX 25 (licensing "all intellectual property rights now or hereafter owned, licensed, or controlled, directly or indirectly, by Cherdak"). Finally, the Licenses generally contained a representation and warranty that Cherdak was the sole owner of the portfolio. See Licenses cited *supra*.

In 2015, Cherdak entered into the Starwood settlement agreement for $20,000, as noted *supra*. PEX23. Yet Cherdak repeatedly assured McKirdy that the settlement was for $200,000 and showed McKirdy a draft settlement agreement to that effect. PTX 28, 31. Based on Cherdak's representation that the paid $20,000 was merely the first payment toward the $200,000 total amount, McKirdy allowed Cherdak to retain the full $20,000. Tr. 4/30/18 at 162. When McKirdy continued to confront Cherdak about the remaining $180,000, Cherdak continued the deception and pretended he would pursue legal action to enforce the agreement. PEX28.

Cherdak similarly concealed the existence of his license agreements with Life Fitness (Brunswick), Technogym, and Johnson Health Tech (Matrix Fitness). Evidence at trial established that these three companies are the largest original equipment manufacturers of fitness

---

[4] While the Google license explicitly excludes the '709 patent, the license conveys an interest in other Fitistics intellectual property. Cherdak, as a trained attorney, could have ensured that all of Fitistics's intellectual property was excluded and he failed to do so.

equipment for Marriott Hotels and a prime target for license agreements pertaining to the Fitistics patent portfolio. *See* Tr. 4/30/18 at 47-48, 148-149, 153. Despite having entered into license agreements with these three companies on April 23, 2015 (PTX 24), August 4, 2015 (PTX 26), and September 23, 2015 (PTX 19), Cherdak concealed these agreements from Fitistics. On April 22, 2015, McKirdy asked Cherdak about the status of the Life Fitness license, to which Cherdak responded, "I don't know . . . thinking." PTX 85. On August 7, 2015, McKirdy asked about a potential payment from Technogym. PTX 85. Despite having entered into a license with Technogym just three days prior, Cherdak replied that he didn't know the status. *Id.*

When McKirdy repeatedly pressed Cherdak about the obvious licensing targets, Cherdak, rather than disclose his deception, tried to end the questioning. *Id.* (Cherdak writing to McKirdy, "Did I ever tell you that you ask stupid questions over and over again. Tiring!"). In the alternative, the evidence demonstrated that Cherdak used legal concepts that McKirdy would not necessarily understand to delay addressing the issue. For example, in response to McKirdy's questions about these licenses, Cherdak wrote on August 13, 2015, "I am getting to that tomorrow...Limelight case on direct infringement of a method claim just came down today en ban[c]. I need to review the case and make some decisions. Absolutely affects direct infringement of a method claim." PTX 85. And on September 8, 2015, after McKirdy sent Cherdak two videos depicting a cell phone syncing with Life Fitness equipment by Bluetooth, a technology similar to that covered in Fitistics' patent portfolio, Cherdak wrote:

> Marriott is being a friend but they are looking to protect their interests too. They are brokering, but they want oems to handle the problem. So finger pointing is going on too. But ipr is big topic and I may just need to refile and let oems file their ipr. If the case comes out of pto then it's strong. If it does not, then this has all been for naught. If I take settlements now they are likely to be smaller and modest and that is where I am getting hung up in my thoughts. 10 years on

8

>patents, should I do what I did with mine and fight reexam. That worked out well at that time before octane. So far I can tell you that while there has been a lot of talk about ipr proceedings, nobody has produced a single reference for me to review - a reference or more than one that would have to be used to drive ipr proceeding. I think that sitting a bit while I Move for more patents may be the best course of action.

*Id.*

Cherdak lied to McKirdy to conceal other agreements he had entered in to. On December 9, 2014, apparently forgetting he had already licensed the Fitistics portfolio to Garmin, Cherdak messaged McKirdy that they should pursue a Garmin license. PTX 15-17. Later that same day, he e-mailed Garmin about that licensing and Garmin advised that he had already licensed the Fitistics portfolio in the July 2013 licensing agreement. Cherdak Dep. 7/25/16 at 131-144 and PTX 15. Cherdak then messaged McKirdy that Garmin would not be a potential licensee and did not respond to McKirdy's subsequent inquiries about it. PTX 16.

Sean McKirdy testified clearly and credibly[5] that had he known about Cherdak's failure to prosecute Fitistics's patent applications in the summer of 2012 it would not have entered into the CAA. He testified clearly and credibly that had he known about Cherdak's misrepresentations about the Core settlement and Cherdak's pre-PRAA licensing of Fitistics's patent portfolio, he would not have entered into the PRAA. Tr. 4/30/18 at 103-106. Robert Nutini, another Fitistics officer, testified similarly and credibly. Trial Tr. 5/1/18 at 384-385. He testified clearly and credibly that had he known about Cherdak's extensive clandestine licensing of the Fitistics patent portfolio subsequent to entering into the PRAA, Fitistics would have moved quickly to enforce its rights under the PRAA.

Because Cherdak's case largely consisted of his own testimony, the Court finds it

---

[5] While Cherdak attempted to impeach McKirdy with evidence of inconsistent statements on his educational background, the Court found the impeachment limited and inconsequential to the rest of McKirdy's testimony. To the extent Cherdak attempted to allege that he was fraudulently induced into the PRAA by a supposed assertion by McKirdy that he had a college degree, Cherdak could not demonstrate that such a representation would have been material to his decision to enter the PRAA, given McKirdy's extensive undergraduate educational record (even in the absence of a degree) and his work experience. Further, there is no credible evidence that Cherdak was unfamiliar with the fact that McKirdy did not have a degree.

necessary to comment on that testimony. The Court found Cherdak's testimony to be wholly incredible, regularly contradicted by common sense and plain evidence before the Court. His character for untruthfulness was well-established at trial. Steven Ward, an attorney who had also received bad checks from Cherdak, testified, "I don't think [Cherdak] has any truthfulness. I mean, frankly, if he told me it was raining outside, I'd have to go check to see if it was before I got my raincoat." 5/2/18 Tr. at 597. Stephen Crenshaw, another attorney, testified that Cherdak "is one of the least honest opponents I've had in my seven-and-a-half years of litigating." *Id.* at 650.

Yet the Court did not need this opinion testimony as Cherdak's character for untruthfulness was apparent on the witness stand, both during his narrative testimony and Plaintiffs' cross-examination.

This Court is also convinced that Cherdak lied to United States Magistrate Judge Judith Dein in the District of Massachusetts on October 1, 2015 at an in-person hearing. Judge Dein directly asked Cherdak about licensing agreements he had failed to turn over in discovery in a separate case and Cherdak asserted that he had turned over all of them. PTX 87. Yet Cherdak failed to disclose to Judge Dein the existence of the Virgin Pulse license agreement, the Johnson Health Tech Company license agreement (which he entered into a mere week before the hearing before Judge Dein), and the Brunswick license agreement, all discussed *supra* and all related to Judge Dein's instruction. *See* 5/2/18 Tr. 637-650.

There is also no doubt that Cherdak perjured himself in this case. Plaintiff, in its Closing Argument on Behalf of Fitistics, LLC and Sean McKirdy (Dkt. 343) accurately summarizes Cherdak's repeated lies upon lies in this case. Cherdak's dishonesty was apparent during the portion of his video deposition played in trial and also apparent on the witness stand. For

example, when confronted with the fact that he perjured himself in financial disclosures to the United States Bankruptcy Court pursuant to the bankruptcy petition he filed on the eve of the original scheduled trial in this matter, Cherdak tried to explain that those documents were prepared by lawyers or otherwise involved complex calculations that did not require complete accuracy. *See* Tr. 5/3/17 at 533-546, PTX 93. In another example, on cross-examination, Cherdak was confronted with telephone calls he made to a gold and silver exchange, seeking information on the purchase of $130,000 in gold while his bankruptcy case was pending. Despite a highly detailed conversation with the exchange representative and Cherdak's apparent extensive familiarity with buying gold, he nonetheless testified at trial, wholly incredibly, that the call was related to a school project for his son. *See* Tr. 5/3/17 at 547-552.

Cherdak himself was the only witness called in the defendant's case. His character for untruthfulness, prior false statements to a federal judge, perjury in filings with the United States Bankruptcy Court, and perjury during his deposition and during the trial in this matter render his testimony worthless to the Court.

## IV. Conclusions of Law

*a. Fraud and Conversion*

Fitistics established by clear and convincing evidence that Cherdak fraudulently induced Fitistics into entering both the CAA and PRAA, and converted all monies due to Fitistics from the resulting Licenses.

The parties agree that Virginia law controls these claims.

Under Virginia law, a party to a contract commits fraud when he conceals a material fact from the other party to the contract and knows that the other party enters the contract on the assumption that the fact does not exist. *Van Deusen v. Snead*, 247 Va. 324, 328, 441 S.E.2d 207,

209 (1994) (citing *Allen Realty Corp. v. Holbert*, 227 Va. 441, 450, 318 S.E.2d 592, 597 (1984) (citation omitted); *accord, Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999).

Under Virginia law, conversion is a tort involving injury to property, in which one wrongfully exercises or assumes authority over another's goods, depriving him of their possession." *Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294, 301 (1998) (citations omitted). "Conversion includes any distinct act of dominion wrongfully exerted over property that is in denial of, or inconsistent with, the owner's rights." *Id.* at 302 (citations omitted).

The evidence at trial established that Cherdak routinely lied by commission and omission during the full length of his relationship with Fitistics. These lies ranged from his false representations about the status of patent applications, to his fiction about the amount of the Starwood settlement, and to his further attempts to justify failing to deliver payments owed under the PRAA. The critical fraud for purposes of fraudulent inducement occurred when he licensed Fitistics's patent portfolio to Garmin, both explicitly and implicitly, prior to entering into the PRAA. There is no evidence but Cherdak's own incredible assertions that he ever made Fitistics or its officers aware of the Garmin agreement. There is ample evidence that he did not, including his own misrecollection of licensing to Garmin, despite a license already existing.

Both Robert Nutini's and Sean McKirdy's testimony was clear and credible that Fitistics would not have assigned rights to its patent portfolio to Cherdak if they had known he had fraudulently represented in the Garmin agreement that he had full rights to that portfolio weeks before entering into the PRAA.

These same acts demonstrate conversion by clear and convincing evidence. Cherdak, by lying about the nature of the Licenses and/or concealing the existence of the Licenses,

wrongfully deprived Fitistics of monies it was due under the PRAA and CAA for the value of its intellectual property. Again, the Court finds that the evidence demonstrates Cherdak converted these funds willfully and maliciously, as demonstrated by Cherdak's extensive efforts to conceal the existence of the Licenses and Cherdak's regularly dishonest acts to justify his failure to pay monies Cherdak knew to be due to Fitistics.

*b. Breach of Contract*

Even if Cherdak had not fraudulently induced Fitistics into the PRAA and the CAA, the preponderance of the evidence establishes that he breached the PRAA and the CAA by failing to pay Fitistics its contractually entitled share of the various license agreements and settlements. In Virginia, breach of contract is established where (1) an agreement sets forth a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant breaches that obligation; and (3) the breach causes injury or damage to the plaintiff. *See Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (Va. 2004). Both the PRAA and the CAA required timely disclosure of license agreements or settlements arising from those works, and timely payment of funds to Fitistics. This was a legally enforceable obligation. Cherdak's concealment of the Licenses and his total nonpayment demonstrate breach of those obligations and the damage to Fitistics is apparent.

*c. Cherdak's Defenses and Claims*

At trial, Cherdak presented evidence, primarily his own testimony, to support allegations of copyright fraud, patent abandonment, a 12.5% partial ownership interest in Fitistics's patent portfolio prior to the PRAA, and defamation. Cherdak's claims were either unpled or largely depended on his self-serving and perjured testimony or both, and the Court finds that he failed to present sufficient evidence to support any of them.

As to copyright fraud, Cherdak also alleged at trial that Fitistics fraudulently induced him

into entering the CAA by not disclosing that code within the copyrighted works may have had other copyright notices embedded within and by not disclosing that ESI, the company that produced the code based on Fitistics's specifications, still had an ownership interest. In other words, he alleges he received less than he was entitled to under the CAA because of Fitistics's fraud. This theory was unpled in any of Cherdak's complaints or answers filed with the Court. Even had it been properly pleaded, the argument is vitiated by the facts of the case – most obviously that Cherdak has a computer science degree, parsed the code at issue, directed the internal copyright notices to be changed, and himself drafted most of the CAA. *See* Trial Tr. 4/30 at 54, 182, 188, 193-194, 217-218; Trial Tr. 5/1 at 280-287; PTX 48; PTX 84; DEX 16. The evidence plainly refutes any allegation that Fitistics or Sean McKirdy engaged in copyright fraud.

Next, Cherdak seemed to allege that Fitistics had abandoned patent applications prior to entering into the PRAA and that the failure to disclose this abandonment to Cherdak constituted fraud. Again, the Court finds this contention unpled and plainly contravened by the evidence, as Cherdak is the person who intentionally abandoned the patents. *See* PTX 93; Trial Tr. 5/2 at 560-562. While Cherdak attempted to paint a picture of abandonment at a single moment in time, the moment Sean McKirdy told Fitistics's lawyer Steve McHugh not to revive the patent applications (again, because that would be Cherdak's responsibility), there is no case law to support a notion that this constituted abandonment. Instead, the evidence was clear that Cherdak knew then that this did not constitute abandonment, yet he knowingly failed to revive those applications. *See* PTX 85, 130, 131, 132. The Court finds this unpled theory of fraudulent inducement to be frivolous and contradicted by all relevant material facts.

At trial, Cherdak contended that he had a 12.5% interest in the Fitistics portfolio through

his work for Ward & Ward. As evidence, he cited his entitlement to 50% of the proceeds derived from his work on Fitistics matters for Ward & Ward, and also from the 25% ownership provision in the Ward & Ward / Fitistics retainer agreement. He argued that if such a 12.5% interest existed, Cherdak's licensing of Fitistics's patent portfolio could be argued to narrowly convey his 12.5% interest independent of the PRAA.

This theory is fanciful. Daniel Ward of Ward & Ward testified that Cherdak never received a 12.5% interest (Tr. 5/2/18 at 626-627), and the plain language of the retainer agreement makes clear that it only contemplated a future assignment of interest in the patent portfolio, while not itself being an assignment. *See* PTX 35. The retainer agreement also makes no contemplation of Cherdak being a third party beneficiary of that agreement. *See id.* Instead, any interest of Cherdak's would have been in monies Ward & Ward might have obtained by operation of a future assignment. *See id.* Cherdak pointed to no document to support his contention and the Court finds his 12.5% ownership theory to be frivolous, a strained post-hoc excuse for his fraud.[6] Even had Cherdak obtained a 12.5% interest, there is no evidence that Ward & Ward continued to believe it held an interest in Fitistic's patents after it ceased representing Fitistics. The evidence is overwhelming that Cherdak failed to prosecute the patents that he had contracted with Ward & Ward to prosecute, vitiating any hypothetical interest. *See Hair Club for Men, LLC v. Ehson*, 2017 WL 1250998, at *4 (E.D. Va. Apr. 3, 2017) (fees must reasonably reflect work performed).

Accordingly, even if Cherdak at some point owned a 12.5% interest, the PRAA still would have fully conveyed rights to Cherdak, since Cherdak would have derived his interest

---

[6] Cherdak attempted to introduce DEX 154 into evidence, referred to in the trial transcript as the "Dear Sean" letter. The document, purportedly from Erik Cherdak to Sean McKirdy, bears no date and is accompanied by no metadata to establish the time it was written, how it was maintained, or how it was conveyed, if at all, to McKirdy. Offered by Cherdak at trial, it is pure hearsay and not admissible evidence. It is clearly a fraudulent document prepared by Cherdak after this litigation commenced.

from Ward & Ward's interest and Ward & Ward had no interest at the time Cherdak entered into the PRAA. Further, even if Ward & Ward *did* still have an interest, Cherdak would have been aware of this at the time he drafted and signed the PRAA, vitiating any claim that Fitistics could have fraudulently induced him to enter the PRAA. Thus, even if Cherdak's contention that he held a 12.5% interest in the portfolio prior to the PRAA is credited in full by the Court, the Court would still find that he fraudulently induced Fitistics to enter the CAA and PRAA and breached those agreements. The death knell to this defense is the catch-22 it creates for Cherdak. As noted, the Licenses he entered generally included a representation and warrant that he was the sole owner of the Fitistics patent portfolio. *See* Licenses cited *supra*.

As to defamation, Cherdak alleges that Sean McKirdy defamed him when McKirdy filed a report with the Newington, Connecticut police department. However, Cherdak put on no evidence to support his claim except for the police reports themselves. Even had Cherdak put on additional evidence,[7] he could not have possibly overcome McKirdy's most obvious defense, that of truth of the statements. *See, e.g., Cweklinsky v. Mobil Chemical Co.*, 837 A.2d 759, 770 (Conn. 2004) ("[F]or a claim of defamation to be actionable, the statement must be false. . ."). The police reports demonstrate that McKirdy and other witnesses made statements to the police that are substantially consistent with the facts established in this case.

McKirdy's communications with the police are also protected under a qualified law enforcement communication privilege. *See Gallo v. Barile*, 935 A.2d 103, 106 (2007). To overcome this qualified privilege, Cherdak had to prove both that McKirdy made false defamatory statements and that McKirdy acted with actual malice or malice in fact, which

---

[7] Some of Cherdak's purported evidence was excluded prior to trial. *See* Dkt. 325. Specifically, Cherdak's Proposed Findings of Fact and Conclusions of Law cites to text messages appearing in Docket Entry 273, Exhibits A and C. These text messages arose from, at best, a blatant discovery abuse and, at worst, pure fabrication. The Court notes that every message appearing in the exhibits, regardless of message length, is sent exactly, to the second, one minute after the last, a ham-handed indicator that the messages were fabricated.

further requires evidence that the false statements were made knowingly or with reckless disregard for their truth. *See id.* Cherdak adduced no evidence to support a finding that McKirdy's communication was not privileged.

For these reasons, Cherdak has failed to carry his burden with respect to his claims for breach of contract, intentional interference with contract, fraud, negligent misrepresentation, copyright infringement, and defamation and Fitistics and Sean McKirdy are entitled to judgment in their favor on all of them.[8]

## V. Relief

Cherdak's liability overwhelmingly established, the Court turns its attention to relief. Fitistics seeks 1) disgorgement of all of Cherdak's profits under the Licenses, 2) at least $350,000 in punitive damages, 3) attorney's fees, 4) rescission of the PRAA and CAA, 5) a declaratory judgment that Fitistics owns 100% of the patent portfolio and the copyrights at issue in this case and has since inception, since the CAA and PRAA were fraudulently induced, and 6) a permanent injunction prohibiting Erik Cherdak from taking any actions with respect to Fititistics's intellectual property, and requiring a complete accounting of his patent prosecution on Fitistics's behalf.

The Court finds that full disgorgement of Cherdak's ill-gotten gains is warranted. *Zaklit v. Glob. Linguist Sols., LLC*, 53 F. Supp. 3d 835, 852 (E.D. Va. 2014) (quoting *Millboro Lumber Co. v. Augusta Wood Products Corp.*, 140 Va. 409, 125 S.E. 306, 310 (Va. 1924)). Fitistics is entitled to the disgorgement of $654,062.50 in Cherdak's proceeds from the Licenses. In consideration of the factors in *Coalson v. Canchola*, 287 Va. 242, 249 (2014), the Court finds

---

[8] Cherdak's operative Proposed Findings of Fact and Conclusions of law only addresses his own defamation claim and Fitistics's breach of contract and tort claims. *See* Dkt. 276. Cherdak never moved to amend that filing and instead filed a new Proposed Findings of Fact and Conclusions of Law (Dkt. 323) fourteen days before trial, which the Court struck as untimely and which depended on other stricken filings that violated FED. R. CIV. P. 26(a)(3). *See* Dkt. 329.

17

that Cherdak's conduct, willful and malicious as it was, necessitates the imposition of punitive damages at the statutory maximum under state law, $350,000.

The Court, by separate order, will declare Fitistics entitled to rescission of the PRAA and CAA and declare that Erik Cherdak has no legal interest in the patent portfolio or copyrights addressed in this case.[9] In addition to this declaration, the Court will enjoin Erik Cherdak from taking any actions with respect to Fititistics's intellectual property and will order Erik Cherdak to file with the Court a complete accounting of his patent prosecution on Fitistics's behalf and a complete accounting of any licenses he may have entered into, yet unknown, pertaining to Fitistics's intellectual property. The Court grants leave to Fitistics and McKirdy to file a motion for attorney's fees and sanctions.

## VI. Conclusion

For these reasons and good cause shown in the trial record, the Court finds in favor of Fitistics, LLC and Sean McKirdy and against Erik Cherdak on all claims and counterclaims in this case and Fitistics will be awarded the relief as described above. A separate Order shall issue.

August 23 2018
Alexandria, Virginia

Liam O'Grady
United States District Judge

---

[9] While true that the Licenses may now be voidable, as the PRAA and CAA are void *ab initio*, the parties to those licenses are not parties to this case and this Court declines to declare the Licenses void in the absence of those parties.